[Cite as *Logan v. Holcomb*, 2013-Ohio-2047.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

JENNIFER LOGAN,

    PLAINTIFF-APPELLANT,                 CASE NO. 9-12-61

    v.

RICHARD HOLCOMB,                      **O P I N I O N**

    DEFENDANT-APPELLEE.


Appeal from Marion County Common Pleas Court
Family Court
Trial Court No. 05 PC 0417

**Judgment Affirmed**

Date of Decision: May 20, 2013


APPEARANCES:

    *Ted I. Coulter* for Appellant

    *J.C. Ratliff and Jon L. Jenson* for Appellee

**ROGERS, J.**

{¶1} Plaintiff-Appellant, Jennifer Logan, appeals the judgment of the Marion County Court of Common Pleas, Family Division, terminating her shared parenting plan with Defendant-Appellee, Richard Holcomb, naming Holcomb as the residential parent of the couple's minor child, A.H., and finding Logan in contempt for denying Holcomb's parental time. On appeal, Logan argues that the trial court erred by: (1) finding that a change in circumstances pursuant to R.C. 3109.04(E)(1)(a) occurred; (2) finding that the termination of the parties' shared parenting plan and naming of A.H. as residential parent was in the best interest of A.H.; (3) failing to consider whether the harm likely to be caused by a change of environment was outweighed by its advantages; and (4) finding that Logan continuously and willfully denied Holcomb's parenting time and was responsible for his attorney fees. For the reasons that follow, we affirm the trial court's judgment.

{¶2} On April 28, 2011, the trial court adopted a shared parenting plan regarding the parties' rights and responsibilities as they relate to care of A.H. Under the plan, Logan was deemed the primary residential parent while Holcomb was entitled to visitation on alternating weekends and every Thursday from 4:00 p.m. to 7:30 p.m. On January 19, 2012, Holcomb filed a motion to hold Logan in contempt of court for violating the visitation provision of the shared parenting

plan. Despite the motion, the trial court did not issue an order to appear in accordance with R.C. 2705.031(C). Nevertheless, on January 30, 2012, Logan's attorney entered an appearance on her behalf.

{¶3} On April 26, 2012, Holcomb filed a motion to terminate the parties' shared parenting plan. Shortly thereafter, Logan responded with a motion to modify the shared parenting plan to reduce Holcomb's visitation time, or, in the alternative, to terminate the plan. The trial court conducted a hearing on September 17, 2012 to resolve the competing motions. During the hearing, the following relevant evidence was adduced.

{¶4} Holcomb called Logan as though on cross-examination. According to Logan, since the imposition of the shared parenting plan, she had moved twice but not informed Holcomb of her new address. At the time of the hearing, Logan lived in Nevada, Ohio, and she acknowledged that neither her family members nor friends live nearby. She also indicated that A.H. did not have any friends in the neighborhood surrounding the house.

{¶5} As to her financial position, Logan testified that she was fired in October 2011 because she failed a drug test. Due to her termination, Logan's only source of income was a biweekly unemployment benefit of $236.00. Logan indicated that the monthly bills she incurred were greater than this limited

unemployment compensation and that she had previously received a shutoff notice for her electricity.

{¶6} Logan stated that A.H. was experiencing some difficulties in school. He was held back a year in the first grade and has displayed difficulties with reading. Further, A.H. had 15 absences and four disciplinary issues in the previous year, including one school suspension. Further, A.H. was not involved in any extracurricular activities. Logan acknowledged that all of these difficulties occurred while she was A.H.'s primary residential parent.

{¶7} In regard to Holcomb's visitation, Logan admitted that she had previously denied Holcomb's visitation on several occasions. One relevant exchange proceeded as follows:

Q: So from October 14th until February 9th [Holcomb] wasn't able to get visitation until he came to court, correct?

A: Yes.

Q: Then even after he started to get visitation in February, you would agree with me that during the month of April, the entire month of May, you would not allow him to have a Thursday mid-week visitation, would you? Ma'am?

A: Every other Thursday, no.

Q: I'm going to ask you that – I had you refer to that to refresh your memory, but I'm asking you –

A: Oh, okay.

Q: - from April, from April and May –

> A:   Correct.
>
> Q:   - he did not get any Thursday visitation, correct?
>
> A:   Not every Thursday, no, he did not.  Tr., p. 61-62.

Similar exchanges occurred regarding other times in which Logan denied Holcomb's visitation.   Logan explained that she denied visitation on some occasions because A.H. had a school play, was being punished for misbehavior, or was sick.  She further testified that Holcomb did not show up on several occasions for his visitation.

{¶8} Logan indicated that she would not accept the visitation schedule she requested for Holcomb in her motion to modify the shared parenting plan.  She explained her reasoning as follows:

> Q:   * * * Would you feel that you were part of your son's life if your visitation was only Saturday from 11:00 to 5:00 or 6:00?
>
> A:   Yes, I would.
>
> Q:   You'd take that schedule?
>
> A:   Being a mother?  No, I wouldn't.
>
> Q:   Do you think there's a difference between being a mother and being a father?
>
> A:   Yes, I do.  I mean, I've never been a father.  I've only been a mother, so –
>
> Q:   Do you think as a mother, that you should be entitled to more visitation?

A:    Being a mother, yes, I do.  Tr., p. 76.

{¶9} Holcomb then took the stand.  He testified that he had lived in the same house in La Rue, Ohio for eight years and that he shares the house with his live-in girlfriend and her teenage daughter.  Holcomb stated that his parents, grandparents, and sister all live within a short distance of the house and that A.H. has a couple of friends in the neighborhood.

{¶10} Like Logan, Holcomb testified that he was unemployed.  He said that he was attending school for robotic engineering.  As a result, Holcomb's live-in girlfriend was primarily responsible for the bills from her income as an employee at Hardin Hospital.  Holcomb indicated that if a job did not materialize for him after graduation, he would return to his work as a laborer for his father's business.

{¶11} Holcomb testified that he played various sports, including baseball, with A.H. and that he wanted his son to participate in sports and other extracurricular activities.  Holcomb also indicated that he was concerned about A.H.'s educational progress.  To facilitate A.H.'s education, Holcomb purchased a LeapFrog learning device for him, but Holcomb testified that it was not used when A.H. went to Logan's house.  Holcomb said that he did not attend parent-teacher conferences because he was never informed of them.

{¶12} Holcomb confirmed that he was "denied a significant part of [his] visitation," including on Christmas, and that Logan did not inform him of her

Case No. 9-12-61

address changes. Tr., p. 90. He specifically testified as follows regarding one denial of his visitation:

Q: And there was some time period then when you went to [the parties' agreed pickup location] and [Logan] wasn't there?

A: Yes, I went to pick [A.H.] up on one of my Thursday visitations and I texted her and asked her if she was sending him out and she replied by saying, no, he's got a bunch of school work and we've moved to Nevada and you don't know where we live, good luck getting him. Tr., p. 93.

Holcomb also testified regarding his attempts to exercise his visitation:

Q: So what were your – what attempts did you try to make to get your visitation then?

A: I had went to – I had texted her and called her, went to her mom and dad's house on days that I was supposed to get him.

Q: When you tried to get him in October, you said – let's say the first time, then, you were denied visitation in October, what attempts do you believe you made to get your son on that first time?

A: I had came [sic] and she had come out and told me, argued with me about his living arrangements, and then I got in the truck and took off at that time. Tr., p. 94.

According to Holcomb, the consistent denial of his visitation led him to "kind of give up on it knowing that [Logan] wasn't going to give [A.H.] to [him]." Tr., p. 98.

{¶13} Holcomb said that he did not cast Logan in a negative light when talking to A.H. He also indicated that he never lost interest in seeing his son. Further, Holcomb testified that he believed that he could do a "better job" as

-7-

A.H.'s primary residential parent than Logan. Tr., p. 110. Still, he wanted Logan to retain visitation because he believed that A.H. needed both parents in his life.

{¶14} Additionally, Holcomb testified to Logan's propensity for calling the police while A.H. is in Holcomb's care:

> Q: Anything else that you think needs to be brought to the Court's attention regarding this matter?
>
> A: Just the fact that [Logan] calls the cops over everything. I mean, it's stated in there the one time she had called the cops and said that she could not have any contact with [A.H.] and she was worried about his well-being, whenever the sheriff wrote it right in his report that she had actually spoke [sic] to [A.H.] right on the phone before she had called and filed her report.
> And then another time she had come [sic] out and tried to get him from my house because I had left him with my girlfriend while I was working for a few hours, and she brought her boyfriend out and her come [sic] out and she called the cops saying that my house was leaking water in his room and it was unsuitable for a child. And when the cops come [sic] out, because she called the cops, and investigated the room and said there was nothing wrong with it and told her, there's nothing you can do and made them leave. Tr., p. 112-13.

{¶15} On cross-examination, Holcomb acknowledged that he did not contact A.H.'s school to discover the times for parent-teacher conferences. He also admitted that during some of his visitations, A.H. stayed at the house of Holcomb's father. Further, Holcomb testified that he was previously charged with domestic violence and pleaded guilty to disorderly conduct.

{¶16} Holcomb also discussed an incident in which A.H. was allegedly injured. The following pertinent exchange about this incident occurred:

Q: Can you explain the incident as far as the trampoline goes and how he ended up with the punch in the chest?

A: We was [sic] wrestling on the trampoline.

Q: And?

A: And what?

Q: What happened that he got a punch in the chest?

A: You make it sound as though I was punching him * * *. We was [sic] wrestling around.

Q: That's why I'm asking, for you to tell me what happened.

A: Nothing. We was running around, playing, jumping on the trampoline, pretend wrestling.

Q: But isn't it true that you did him, that you did punch him?

A: Wrestling around, yes.

Q: No, I didn't say wrestling, I said punching him. Did you punch him?

A: I might have tapped him.

Q: Tapped him? Did it leave a bruise?

A: A pea-sized bruise. Tr., p. 126-27.

{¶17} Holcomb further discussed the living arrangements in his house. The house is actually a trailer with three small bedrooms of which A.H. had one to himself. He also indicated that lived in the house rent-free.

{¶18} Holcomb admitted that he did not know of several of A.H.'s medical ailments. He also said that on a previous occasion, he refused to pay A.H.'s medical bills. Further, Holcomb testified that his girlfriend and mother had paid some of his child support obligations for A.H.

{¶19} After Holcomb's offered his testimony, he rested.

{¶20} Logan then took the stand a second time to present her own case-in-chief. She discussed a safety plan that she received from Children's Services. The plan instructed Logan to not allow Holcomb to have any contact with her or A.H., which precluded her from allowing Holcomb's visitation for a week. However, after investigating Holcomb for a week due to the trampoline incident described above, Child Services withdrew the safety plan and Logan said that she restarted allowing Holcomb to have his visitation.

{¶21} Logan explained her basis for the termination of the shared parenting plan as follows:

> I feel that [Holcomb] is not – like he stated his self [sic], he's given up on [A.H.]. He's given up coming to get him. He – he puts other people in front of [A.H.]. He doesn't hold [A.H.] up to where he needs to be and [A.H.] comes home and he's upset about things. Tr., p. 157.

She also testified that her communication with Holcomb has completely broken down and that his family members have interfered with their relationship.

{¶22} On cross-examination, Logan admitted that she has spoken unfavorably of Holcomb with A.H. She also acknowledged that she audio recorded her conversations with A.H. about his weekend visitations with Holcomb. Once Logan offered her testimony, she rested.

{¶23} The trial court admitted into evidence the assessment prepared by the Family Services Coordinator after its investigation, which included interviews with A.H., Logan, and Holcomb. The assessment indicated that A.H. was angry with his situation and "expressed that he would like to live with his dad." (Court's Exhibit 1, p. 7). The assessment also stated that "[b]ased on [Logan]'s notes she was non-responsive to some of [Holcomb]'s attempts to execute his parenting time with [A.H.]." (*Id.* at p. 8). After its investigation, the Family Services Coordinator recommended that the shared parenting plan continue, but that Holcomb no longer have Thursday visitation time due to A.H.'s academic and behavioral issues.

{¶24} On October 1, 2012, the trial court issued its ruling on the parties' competing motions. It found that Logan denied Holcomb's visitation rights "on numerous occasions" from October 2011 to February 2012 and that she failed to inform him of her changes in address. (Docket No. 73, p. 2). As a result, the trial court found that Logan was in contempt of court and ordered that she pay Holcomb's attorney fees for bringing the contempt motion.

{¶25} The trial court also ordered that the parties' shared parenting plan be terminated. In doing so, the trial court applied R.C. 3109.04(E)(2)(c), extensively discussed its consideration of the factors contained in R.C. 3109.04(F)(1), and found that the termination of the plan was in A.H.'s best interests. The trial court also found that a change in circumstances, as manifested by the parties' inability to communicate and effectuate the shared parenting plan's visitation provisions, supported the termination of the plan. In addition to the termination of the shared parenting plan, the trial court named Holcomb the residential parent and legal custodian of A.H. while granting Logan parenting time in accordance with Loc.R. 32.

{¶26} Logan timely appealed the trial court's judgment, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**IN SUPPORT OF THE TERMINATION OF THE PRIOR PARENTING PLAN FOR THE MINOR CHILD, THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION BY DETERMINING THERE WAS A SUBSTANTIAL AND SUFFICIENT "CHANGE IN CIRCUMSTANCES" PURSUANT TO OHIO REVISED CODE 3109.04(E)(1)(A).**

*Assignment of Error No. II*

**IN SUPPORT OF THE MODIFICATION OF THE PRIOR PARENTAL RIGHTS AND RESPONSIBILITIES FOR THE MINOR CHILDREN [SIC] AND PURSUANT OF [SIC] OHIO REVISED CODE 3109.04(E)(1)(A) AND 3109.04(E)(1), THE**

**TRIAL COURT ERRED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND ABUSED ITS DISCRETION IN DETERMINING "THAT THE MODIFICATION IS NECESSARY TO SERVE THE BEST INTEREST OF THE CHILD."**

*Assignment of Error No. III*

**IN SUPPORT OF THE TERMINATION OF THE PRIOR SHARED PARENTING PLAN FOR THE MINOR CHILD AND PURSUANT OF [SIC] OHIO REVISED CODE 3109.04(E)(1)(A)(III), THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY DETERMINING THAT "THE HARM LIKELY TO BE CAUSED BY A CHANGE OF CIRCUMSTANCES IS OUTWEIGHED BY THE ADVANTAGE THAT A CHANGE OF ENVIRONMENT WOULD HAVE ON THE MINOR CHILD."**

*Assignment of Error No. IV*

**IN SUPPORT OF THE FINDING OF THE PLAINTIFF-APPELLANT IN CONTEMPT OF COURT, THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY DETERMINING THAT THE PLAINTIFF-APPELLANT HAD CONTINUOUSLY AND WILLFULLY DENIED THE DEFENDANT-APPELLEE PARENTING TIME AND SHOULD PAY ATTORNEY FEES.**

{¶27} Due to the nature of the assignments of error, we elect to address Logan's first and third assignments of error together.

*Assignments of Error Nos. I & III*

{¶28} In her first assignment of error, Logan argues that the trial court erred in finding that there was a change of circumstance under R.C. 3109.04(E)(1)(a). Meanwhile, in her third assignment of error, Logan contends that the trial court

erred in failing to consider whether the harm of naming Holcomb as the residential parent was outweighed by its advantages pursuant to R.C. 3109.04(E)(1)(a)(iii). Because we find that R.C. 3109.04(E)(2)(c), and not R.C. 3109.04(E)(1)(a), applies to this matter, we disagree with Logan.

*Standard of Review*

**{¶29}** Decisions concerning child custody matters rest within the sound discretion of the trial court. *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). Custody determinations "are some of the most difficult and agonizing decisions a trial judge must make," and, therefore, appellate courts grant "wide latitude" to their consideration of the evidence. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). As such, a reviewing court will not reverse a trial court's decision regarding child custody absent an abuse of discretion. *Masters v. Masters*, 69 Ohio St.3d 83, 85 (1994). A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 17-18 (2d Dist.). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Further, in applying abuse of discretion review here, we are mindful that "[w]hile a trial court's discretion in a custody

modification proceeding is broad, it is not absolute, and must be guided by the language set forth in R.C. 3109.04." *Miller* at 74.

*R.C. 3109.04(E)(1)(a) and (E)(2)(c)*

{¶30} There is disagreement among the parties as to which section of the Revised Code controls this matter. Logan suggests that R.C. 3109.04(E)(1)(a) applies here. This section provides as follows:

> The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:
>
> (i)   The residential parent agrees to a change in the residential parent or both parents under a shared parenting decree agree to a change in the designation of residential parent.
>
> (ii)   The child, with the consent of the residential parent or of both parents under a shared parenting decree, has been integrated into the family of the person seeking to become the residential parent.
>
> (iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child. R.C. 3109.04(E)(1)(a).

Under this provision, trial courts must determine three things: "(1) Has there been a change in circumstances? (2) Is this modification in the best interest of the child?

(3) Will the harm that will result from the change be outweighed by the benefits that will result from the change?" *Clark v. Smith*, 130 Ohio App.3d 648, 653 (3d Dist. 1998). In *Eatherton v. Behringer*, 3d Dist. No. 13-11-12, 2012-Ohio-1584, we found "that the trial court must independently determine *each step* within R.C. 3109.04(E)(1)(a)." (Emphasis added.) *Id*. at ¶ 14.

{¶31} Conversely, Holcomb points us to R.C. 3109.04(E)(2)(c), which provides, in relevant part, as follows:

> (E)(2) In addition to a modification authorized under division (E)(1) of this section:
>
> * * *
>
> (c) The court may terminate a prior final shared parenting decree that includes a shared parenting plan approved under division (D)(1)(a)(i) of this section upon the request of one or both of the parents or whenever it determines that shared parenting is not in the best in interest of the children. The court may terminate a prior final shared parenting decree that includes a shared parenting plan approved under division (D)(1)(a)(ii) or (iii) of this section if it determines, * * * upon the request of one or both parents, that shared parenting is not in the best in interest of the children.

By R.C. 3109.04)(E)(2)(c)'s plain terms, it merely requires that the party seeking a termination of a shared parenting plan prove that the termination is in the best interests of the minor child. *See Kougher v. Kougher*, 194 Ohio App.3d 703, 2011-Ohio-3411, ¶ 18 (7th Dist.) ("The appellate courts that have dealt with this specific question have concluded that R.C. 3109.04(E)(2)(c), clearly labeled in the statute as a different procedure from that detailed in R.C. 3109.04(E)(1)(a),

-16-

requires only that the termination of a shared-parenting decree be in the best interests of the child."). As such, when R.C. 3109.04(E)(2)(c) applies, "the trial court is not required to determine the existence of a change of circumstances prior to the *termination* of a shared parenting plan." (Emphasis sic.) *Green v. Richards*, 6th Dist. No. WD-12-039, 2013-Ohio-406, fn. 1; *accord Curtis v. Curtis*, 2d Dist. No. 25211, 2012-Ohio-4855, ¶ 7; *Nolan v. Nolan*, 4th Dist. No. 11CA3444, 2012-Ohio-3736, ¶ 43; *In re J.L.F.*, 8th Dist. No. 97405, 2012-Ohio-1748, ¶ 4; *In re K.R.*, 11th Dist. No. 2010-T-0050, 2011-Ohio-1454, ¶ 47. The trial court is likewise not required to determine the balance of harm and benefits that comes with changing the child's residential parent. *See Kougher* at ¶ 25 (finding that R.C. 3109.04(E)(2)(c) only requires that a party show that a termination of the shared parenting plan is in the best interest of the child).

{¶32} Here, both parties requested the termination of their shared parenting plan in their motions. Further, the trial court indicated that it applied R.C. 3109.04(E)(2)(c) in rendering its decision and explicitly ordered the termination of the parties' shared parenting plan. As a result, we are compelled to find that R.C. 3109.04(E)(2)(c) applies to this matter and that the trial court was not required to find either a change in circumstances or that the harm of a change in residential parent was outweighed by its advantages. *See Poshe v. Chisler*, 11th Dist. No. 2010-L-017, 2011-Ohio-1165, ¶ 21 (finding that "[d]ue to the clear and plain

language of the magistrate's finding and the trial court's entry, the shared parenting plan was terminated"). Since these issues are immaterial to the trial court's ultimate determination, Logan's first and third assignments of error challenge findings that have no bearing on the trial court's ruling.[1] *See id.* (overruling assignment of error challenging termination of a shared parenting plan due to the trial court's failure to assess a change in circumstances on the grounds that R.C. 3109.04(E)(2) applied and there was no need for such an analysis). As such, we are unable to find any reversible error in the trial court's judgment on these bases.

**{¶33}** Accordingly, we overrule Logan's first and third assignments of error.

*Assignment of Error No. II*

**{¶34}** In her second assignment of error, Logan argues that the trial court erred in finding that the termination of the parties' shared parenting agreement and the naming of Holcomb as residential parent were in A.H.'s best interests. We disagree.

---

[1] The trial court, relying on *In re Illig*, 3d Dist. No. 13-08-26, 2009-Ohio-916, indicated that it had to consider whether a change in circumstance occurred before deciding to terminate the shared parenting plan. However, *Illig* is inapposite here because it involved the application of R.C. 3109.04(E)(2)(b) and its modification of the terms contained in a shared parenting plan. *Id*. at ¶ 15-16. Since *Illig* did not implicate the termination of a shared parenting plan, our decision there is distinguishable from this matter. Similarly, *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, does not apply here either because its holding only implicates the modification of shared parenting plans under R.C. 3109.04(E)(1)(a). *See In re K.R.*, at ¶ 48 (distinguishing *Fisher* on the grounds that the matter involved the termination of a shared parenting plan, not a modification of terms).

**{¶35}** When terminating a shared parenting plan under R.C. 3109.04(E)(2)(c), the trial court must consider the best interests of the child. To appropriately perform this analysis, courts must take into account the factors outlined in R.C. 3109.04(F)(1), which are as follows:

(a)   The wishes of the child's parents regarding the child's care;

(b)   If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c)   The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d)   The child's adjustment to the child's home, school, and community;

(e)   The mental and physical health of all persons involved in the situation;

(f)   The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g)   Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h)   Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the

abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i)    Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j)    Whether either parent has established a residence, or is planning to establish a residence, outside this state.

The trial court is also empowered to consider any other relevant factor. R.C. 3109.04(F)(1).

{¶36} After deciding to terminate a shared parenting plan, "the court shall proceed and issue a modified decree for the allocation of parental rights and responsibilities for the care of the children under the standards applicable under divisions (A), (B), and (C) of this section as if no decree for shared parenting had been granted and as if no request for shared parenting ever had been made." R.C. 3109.04(E)(2)(d).  Pursuant to R.C. 3109.04(B)(1), trial courts are required to

"take into account that which would be in the best interest of the children" when determining how to allocate parental rights and responsibilities.

*The Trial Court's Best Interests Analysis*

{¶37} When reviewing a trial court's best interests analysis, we need only address two items: "(1) [whether] the trial court considered all of the necessary factors listed in R.C. 3109.04(F)(1); and (2) [whether] there is competent, credible evidence supporting the trial court's conclusion that it was in the children's best interest to designate [the other parent] as residential parent." *Heiser v. Heiser*, 3d Dist. No. 10-07-02, 2007-Ohio-5487, ¶ 27. Here, the first prong of our inquiry is satisfied because the trial court explicitly indicated that it considered the factors contained in R.C. 3109.04(F)(1) before terminating the parties' shared parenting plan. Indeed, the trial court separately addressed each item of R.C. 3109.04(F)(1) in its judgment entry.

{¶38} Further, we find that the second prong of our inquiry is satisfied. Based on the evidence adduced at the hearing, A.H.'s current living situation has resulted in slow educational development and several serious disciplinary issues at school. Moreover, the record is replete with evidence supporting the trial court's finding that Logan has consistently denied Holcomb's parenting time and that the parties have a hostile relationship. The record also supports the trial court's finding that Logan has interfered with the development of Holcomb's and A.H.'s

relationship. She has talked negatively about Holcomb, concealed her address, failed to discuss A.H.'s education with Holcomb, and has sought to implicate Holcomb in negative conduct by calling the police multiple times and interrogating her son after weekend visits. Finally, according to the Family Services assessment, A.H. is angry and has an interest in living with Holcomb, with whom he has a good relationship. Based on this evidence, we are unable to find that the trial court abused its discretion in terminating the shared parenting plan and naming Holcomb as the residential parent.

{¶39} On appeal, Logan points to several portions of the record indicating that the termination of the shared parenting plan and naming of Holcomb as residential parent is not in A.H.'s best interests. She also claims that it was erroneous for the trial court to give more weight to Holcomb's testimony than her own. While there is indeed evidence suggesting that A.H.'s best interests would be best served if Logan was the residential parent or shared parenting continued, it is not so overwhelming as to suggest that the trial court abused its discretion in concluding to the contrary. *See Weese v. Griesheimer*, 4th Dist. No. 98CA2436 (Mar. 11, 1999) ("Upon review, we find strong evidence supporting both positions [as they relate to the child's best interests]. Bearing in mind that we are not free to substitute our judgment for that of the trial court, we find that the trial court did not err [in selecting one of the positions]."). Also, the trial court was well within

its discretion to grant greater weight to Holcomb's testimony over Logan's testimony. *See Sellers v. Sellers*, 4th Dist. No. 09CA45, 2010-Ohio-3712, ¶ 17 ("We observe that appellant's main complaint appears to be that the trial court did not credit her witnesses and their testimony. As we have noted, however, credibility, especially in child custody matters, is a matter reserved for the trier of fact and we will not second-guess credibility determinations."). As such, we find Logan's arguments to be unavailing.

{¶40} Accordingly, we overrule Logan's second assignment of error.

*Assignment of Error No. IV*

{¶41} In her fourth assignment of error, Logan contends that the trial court improperly found that she was in contempt of court for denying Holcomb's parenting time. She advances both procedural and substantive grounds for her argument. First, Logan argues that the contempt finding was improper because the trial court did not issue an order to appear under R.C. 2705.031(C). Second, she asserts since Holcomb did not offer corroborating evidence for his own testimony, he failed to provide clear and convincing evidence to support a contempt finding. We disagree with both of Logan's arguments.

*Logan's Procedural Argument*

{¶42} Pursuant to R.C. 2705.031, a contempt action is appropriate where a party has been denied his parenting time under a shared parenting plan. Both the

statute for contempt proceedings arising from the denial of parenting time and "[t]he tenets of procedural due process mandate that the alleged contemnor receive notice of the charges through a court." *Sancho v. Sancho*, 114 Ohio App.3d 636, 641 (3d Dist. 1996), citing R.C. 2705.031(C) ("In any contempt action initiated pursuant to division (B) of this section, the accused shall appear upon the summons and order to appear that is issued by the court."). But, procedural due process rights are waivable and a party's failure to challenge a lack of notice of contempt charges in the trial court effectuates a waiver. *Id.*, citing *D.H. Overmyer Co. of Ohio v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775 (1971). Here, Logan did not object to the lack of notice regarding the contempt charges brought by Holcomb and in fact she proceeded to defend against the charges at the hearing. As such, she has waived this issue and we are unable to find that the lack of notice gives rise to a reversal. *Id.* at 642; *accord State v. Miller*, 5th Dist. No. 02 CA 16, 2003-Ohio-948, ¶ 31.

*Logan's Substantive Argument*

{¶43} A finding of contempt must be based on clear and convincing evidence. *Pugh v. Pugh*, 15 Ohio St.3d 136, 139 (1984). Clear and convincing evidence is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103 (1986). This

standard is "intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt in criminal cases. It does not mean clear and unequivocal." *Id.* at 104. Additionally, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). Thus, we are required to determine whether the trial court's determination was supported by sufficient credible evidence to satisfy the requisite degree of proof. *In re McCann*, 12th Dist. No. CA2003-02-017, 2004-Ohio-283, ¶ 12.

**{¶44}** The central thrust of Logan's argument is that Holcomb did not present clear and convincing evidence to support a contempt finding because he failed to corroborate his own testimony that Logan denied him parenting time. There are two flaws with this argument. First, Holcomb's testimony about the denial of his visitation time was confirmed by Logan's own admissions in her testimony. She acknowledged that on several occasions, she would not allow Holcomb to take A.H. during visitations. This acknowledgment was confirmed in the Family Services Coordinator's assessment, which indicated that Logan's notes show she denied Holcomb's parenting time on several occasions. Further, Logan admitted that she purposefully kept her address from Holcomb and was

confrontational with him on occasions that he sought to exercise his visitation rights. These admissions, combined with Holcomb's extensive testimony regarding the denial of his visitation and the Family Services Coordinator's assessment, constitute sufficient credible evidence to support the trial court's finding of contempt.

{¶45} Second, Logan has not cited, and we cannot find, a case that requires corroboration of a party's testimony to satisfy the clear and convincing evidence threshold. Indeed, Ohio courts, including the Supreme Court, have consistently recognized that the testimony of a single witness can satisfy such a threshold. *E.g.*, *Cross* at 478 ("The mere number of witnesses * * * is not to be taken as a basis for resolving disputed facts."); *Knox v. Knox*, 7th Dist. No. 04 JE 24, 2006-Ohio-1154, ¶ 52 ("The clear and convincing evidence standard may be met by the testimony of a single witness."); *Baker v. Blevins*, 162 Ohio App.3d 258, 2005-Ohio-3664, ¶ 13 (2d Dist.) ("[A] party is not precluded from establishing a case by clear and convincing evidence simply because there are conflicts in the testimony. A court may choose * * * to believe the testimony of one witness over another."). In light of the flaws in Logan's argument and because the record contains sufficient credible evidence, from both Holcomb's and Logan's testimony, as well as the Family Services Coordinator's assessment, to support the trial court's judgment, we decline to second guess it or to disturb it on appeal.

{¶46} Accordingly, we overrule Logan's fourth assignment of error.

{¶47} Having found no error prejudicial to Logan, in the particulars assigned and argued, we affirm the trial court's judgment.

*Judgment Affirmed*

**PRESTON, P.J. and SHAW, J., concur.**

**/jlr**