[Cite as *White v. Smedley's Chevrolet*, 2016-Ohio-968.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| SAYLOR WHITE | : | |
| | : | |
| Plaintiff-Appellant | : | C.A. CASE NO.   26637 |
| | : | |
| v. | : | T.C. NO. CVF14-00989 |
| | : | |
| SMEDLEY'S CHEVROLET | : | (Civil Appeal from |
| | : |  Municipal Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___11th___ day of ___March___, 2016.

. . . . . . . . . . .

SAYLOR WHITE, 326 Walton Avenue, Dayton, Ohio 45417
        Plaintiff-Appellant

MICHAEL C. MAHONEY, Atty. Reg. No. 0080111 and SEAN A. GRAVES, Atty. Reg. No. 0088233 and STEPHEN V. FREEZE, Atty. Reg. No. 0012173, Fifth Third Center, 1 S. Main Street, Suite 1800, Dayton, Ohio 45402
        Attorneys for Defendant-Appellee

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Saylor White, pro se, appeals from a judgment of the Vandalia Municipal Court, which granted summary judgment to Smedley's Chevrolet on White's claims.   For

the following reasons, the trial court's judgment will be affirmed.

## I. Procedural Background

{¶ 2} On or about June 25, 2012, White purchased a used 2008 Chevrolet Impala with approximately 78,000 miles from Smedley's Chevrolet ("Smedley's") in Vandalia. White also bought a third-party warranty/service contract from GWC Warranty for $1,500. White financed the entire purchase amount of $13,422, which included the vehicle ($13,350), service contract ($1,500), documentary fee ($250), tax ($1,057), and title fee ($15), minus a trade-in allowance of $2,750. (Def.'s Ex. D.) According to White, Smedley's used "high pressure" tactics to induce the purchase. After the sale, the Impala allegedly had numerous maintenance issues, and White repeatedly brought the vehicle to Smedley's and other repair centers for service. The repairs allegedly were not covered by the GWC Warranty service contract and Smedley's allegedly failed to repair certain items that it had agreed to repair. In January 2014, White sold the vehicle to his father so that he could pay off the loan.

{¶ 3} On June 24, 2014, White filed a Complaint in the municipal court, alleging that Smedley's engaged in a variety of wrongful conduct related to White's purchase of the Impala. White alleged that Smedley's sold the vehicle to him for an amount greater than agreed upon, that he was pressured into purchasing the vehicle, that the vehicle was a "lemon," that Smedley's knew of the problems with the vehicle, and that Smedley's failed to honor its contracts with White. White alleged three causes of action, claiming that Smedley's engaged in (1) price shifting and changing of the quoted and promised price, (2) unscrupulous sales tactics and misrepresentation of its products, and (3) breach of contract and violations of the Ohio Consumer Sales Practices Act. White sought

$15,000, plus interest.

{¶ 4} Smedley's filed an Answer to White's complaint, denying the allegations.

{¶ 5} On September 26, 2014, Smedley's moved to have its Request for Admissions deemed admitted. The Request for Admissions asked White to admit "that you purchased the vehicle in an 'as-is' condition" and that he "signed the document attached hereto as Exhibit A regarding the 'as-is' sale of the vehicle." Counsel for Smedley's submitted an affidavit stating that Smedley's had served White with its Request for Admissions on August 14, 2014, and as of September 24, 2014, White had not responded. White did not respond to Smedley's motion, and the trial court granted it.

{¶ 6} White's deposition was taken on December 3, 2014; a transcript of the deposition and the accompanying exhibits were filed with the trial court.

{¶ 7} On December 9, 2014, Smedley's moved for summary judgment. It asserted that the uncontroverted facts established that White voluntarily signed a sales contract, which specified the price, taxes and fees, trade-in allowance, and financing balance; Smedley's stated that "[t]he contract and all pricing were transparent." Smedley's further argued that White purchased the vehicle in "as is" condition, and White had no evidence to establish breach of contract or of the Ohio Consumer Sales Practices Act. Smedley's supported its motion with White's deposition testimony and accompanying exhibits and White's deemed admissions.

{¶ 8} White opposed the motion, and he supported his version of events with a sworn "verification" that the statement of facts contained in his opposition memorandum was "true to the best of his knowledge and belief." White also filed numerous documents (several which were identical to those relied upon by Smedley's), photographs, a video

recording of the Impala, and audio recordings; these exhibits were filed as his "Disclosure of Trial Exhibits," but they were referenced in his opposition memorandum. Finally, White filed a motion for sanctions against Smedley's, claiming that Smedley's failed to answer White's interrogatories and to produce documents in a timely manner.

{¶ 9} The trial court granted Smedley's motion for summary judgment and denied White's motion for sanctions. In granting judgment to Smedley's, the trial court emphasized that White test drove the vehicle twice, purchased the Impala "as is," and had an opportunity to review the documentation that he signed, but chose not to do so. The court found, as a matter of law, that White was presented an opportunity to read the documents and signed them voluntarily, that the "as is" provision obligated White to take the vehicle as it was found, including any defects or problems, and that White voluntarily purchased a warranty from Smedley's for $1,500. The court concluded that there was no breach of contract and that White had not established any violation of the Ohio Consumer Sales Practices Act. The court entered judgment in favor of Smedley's on White's claims.

{¶ 10} White appeals from the trial court's judgment, claiming that the trial court erred in granting summary judgment to Smedley's.

## II. Summary Judgment Standard

{¶ 11} Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998). The moving party

carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). To this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996).

{¶ 12} Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. *Dresher* at 293; Civ.R. 56(E). Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Id.* Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 13} We review the trial court's ruling on a motion for summary judgment de novo. *Schroeder v. Henness*, 2d Dist. Miami No. 2012 CA 18, 2013-Ohio-2767, ¶ 42. De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence, without deference to the trial court, to determine whether, as a matter of law, no genuine issues exist for trial. *Ward v. Bond*, 2d Dist. Champaign No. 2015-CA-2, 2015-Ohio-4297, ¶ 8.

### III. Evidence Submitted for Summary Judgment Motion

### A. Smedley's Evidence

{¶ 14} Smedley's evidence in support of its summary judgment establishes the following facts.

{¶ 15} At the time of the deposition, White was 48 years old. He had three years of college education. When White was in his early 20s, he worked for about a year as a

salesman for Voss, an automobile dealership, and he worked for another dealership detailing cars. White has purchased several vehicles in the past, and he has filed lawsuits against other dealerships due to alleged discrepancies in the purchase price and the quality of repairs.

{¶ 16} On June 25, 2012, White was headed to an Auto Expressions dealership to view an Impala, when he stopped at Smedley's Chevrolet in Vandalia. (White Depo. at 58-60.) At Smedley's, White spoke with a salesperson about an Impala. The salesperson asked, "What can we do to get you in this car?" (*Id.* at 61.) White test drove the Impala down the street with the salesperson. (*Id.* at 65.) White stated that he informed the salesperson that the brakes shook badly when pressed. (*Id.*) White acknowledged that he did not report a problem with the brakes in his interrogatory responses, but he said he had forgotten about this test drive when he completed those responses. (*Id.* at 67.)

{¶ 17} After the test drive with the salesperson, White, in his own car, went to Auto Expressions and test drove the Impala from that dealership to Smedley's and back. (*Id.*) White returned to Smedley's in his own vehicle and drove Smedley's Impala, by himself, for approximately 20 to 30 minutes, driving it to the other dealership and back. (*Id.* at 64.) Auto Expressions offered to sell its Impala to White for $14,500, plus taxes and fees; Auto Expressions did not permit White to trade-in his vehicle. (Def.'s Ex. Z.)

{¶ 18} White testified that Smedley's promised to sell the Impala for $13,000, an amount that White claimed was $500 less than what Auto Expressions was offering. (White Depo. at 61, 85.) White further testified that he and Smedley's used car sales manager, Don Johnson, had an agreement that Smedley's would fix certain problems

with the vehicle, including the removal of a pinstripe on the front fender. (*Id.* at 54-55.) White also stated that he told Johnson that he "needed $3,500 out of my car * * * and he [the sales manager] said he was going to * * * see * * * about getting me that." (*Id.* at 71.) White testified that Johnson had someone check over White's car. White further testified that the sales manager said he would give White $3,500 for the trade-in if White would take the Impala home that night. (*Id.* at 73.) White stated that he "didn't find out that I didn't [get $3,500] until that night after I started to notice things, go over the paperwork, figured it out that I didn't." (*Id.* at 72.)

{¶ 19} White stated that some of his agreement with the sales manager was written down, but it was "verbally mostly." White stated that he signed the Buyer's Guide and Warranty Disclaimer, despite the verbal agreement, because of the GWC Warranty he purchased for $1,500. (*Id.* at 55.) White testified that he did not read the documents before he signed them. He testified, "[W]e were going back and forth. He kept putting things up for me to sign and stuff. All of it was in a pile. So, no, I didn't take out every one and read it and, you know. I just assumed that he [the sales manager] was being aboveboard with me." (*Id.* at 72.)

{¶ 20} On June 25, White signed a purchase agreement to buy the Impala for $13,350, plus a service contract ($1,500), documentary fee ($250), tax ($1,057), and title fee ($15), minus a trade-in allowance of $2,000. (Def.'s Ex. C.) The total price was $14,172. (*Id.*) White further testified that he signed the 3 Day Used Vehicle Exchange Policy (Def.'s Ex. G), the Limited Right to Cancel – Purchase (Def.'s Ex. H), and the Delivery Report (Def.'s Ex. K.) (White Depo. at 75.) The Delivery Report did not identify any items that Smedley's agreed to repair post-delivery of the vehicle to White. White

also acknowledged signing the Odometer Disclosure Statement (Def.'s Ex. I), although he believed the actual mileage at the time of purchase was 300 or 400 miles more than stated. (White Depo. at 76-77.)

{¶ 21} White testified that he signed the documents, but he did not have an opportunity to review them. White explained that the "only time I went over to the office was to sign the documents, and basically I just signed the documents. * * * I wasn't looking over them. * * * I just assumed that they were correct." (*Id.* at 34.) When asked if he was prevented from looking over the documents, White responded, "I don't recall. I don't think so." (*Id.*) White acknowledged that he could have reviewed the documents before he signed them. (*Id.* at 35.)

{¶ 22} White understood that, when he purchased the Impala, the vehicle was sold in an "as is" condition. (*Id.* at 36; Request for Admissions.) When shown the "Buyer's Guide" (Def.'s Ex. E), which explained that "as is" means that there is no warranty, White stated that he signed it, but he "didn't bother to read that at the time." (White Depo. at 37.) White also indicated that he signed the "As Is Dealer Warranty Disclaimer" (Def.'s Ex. F), but he did not read the document before he signed it. (White Depo. at 38.)

{¶ 23} White signed a second purchase agreement, which increased the trade-in allowance to $2,750, but was otherwise the same in terms of cost; the total cost was reduced to $13,422. (Def.'s Ex. D.) The second purchase agreement also differed in that a "See Vehicle Delivery Report Attached" box was marked. The second purchase agreement was dated June 25, 2012 (the same day as the first contract), but White testified that it was actually executed on June 26, 2012.

{¶ 24} White identified Defendant's Exhibit L, a second Delivery Report, dated

June 25, which indicated that Smedley's would perform certain repairs: (1) run ozone in vehicle, (2) replace pinstripes on fender, (3) repair moon roof, (4) reclean vehicle, and (5) provide one key fob. White stated that, as different items were negotiated, the salesperson would write out another document. (White Depo. at 79.) Defendant's Exhibit M, titled "We Owe," was a document that indicated Smedley's obligation to perform the work listed in Exhibit L. Both the Vehicle Delivery Report and the We Owe document required White to make an appointment within 30 days to have those items repaired.

{¶ 25} White acknowledged that he signed a Promissory Note and Disclosure Statement with MidUSA; that document itemized the cost of the vehicle, taxes, fees, and other items that were financed. (Def.'s Ex. O; White Depo. at 80-81.) The total amount financed was $13,422, the reduced amount. White identified the contract application for the warranty, and the warranty contract cancellation request, dated February 7, 2013 (Def.'s Ex. V, Def.'s Ex. W; White Depo. at 81-82.)

{¶ 26} White stated that the salesperson talked him into getting the warranty, but he acknowledged that he could have declined the warranty. (White Depo. at 86-87.) According to the GWC Warranty Contract Application, White selected a "comprehensive" plan for the term of 36 months or 38,000 miles with a $100 deductible. The available plans were a powertrain, standard, comprehensive, or ultra plans; various terms were available, ranging from 90 days/4,500 miles to 48 months/50,000 miles.

{¶ 27} White testified that he noticed several problems with the vehicle after he took the vehicle home that day (June 25). The problems, many of which were listed in a Better Business Bureau complaint, included that the car shook badly when the brakes

were engaged, the roof opened but would not close, the power locks did not work correctly, the car had only one key fob, the pinstripes were put on crookedly, and the vehicle was in bad condition. (White Depo. at 68.) White's interrogatory responses identified numerous additional alleged problems with the Impala. (Def.'s Ex. A.) White stated that he brought the car back to Smedley's the next day (June 26) and asked to rescind the contract. (White Depo. at 68-69.) White testified that Smedley's "said they were going to fix everything that was wrong with it." (*Id.* at 70.)

{¶ 28} White testified that Smedley's corrected the pinstripe on the front fenders and put a "temporary fix" on the roof. (*Id.* at 74.) White stated that he bought a new key fob himself. (*Id.*)

{¶ 29} White owned the vehicle for approximately 18 months. (*Id.* at 41.) Between June 2012 (when he purchased the vehicle) and February 2013, he had driven approximately 10,000 miles with the vehicle. (*Id.* at 42.) White stated that he took the Impala to Martin's Auto on three occasions for repairs: (1) August 24, 2012 for $570.18; (2) September 30, 2012 for $1,162.06; and (3) an unspecified time for $335.40. (*Id.* at 52.) White testified that he also paid Smedley's for fixing the brakes, and he paid Midas to repair the wheel assembly. (*Id.* at 53.) White's interrogatory responses listed repair costs totaling $8,900. (Def.'s Ex. A.) White stated that, every time he took his car to Smedley's for repairs, he was told that the repairs were not covered under his warranty. (White Depo. at 94-95.) After White complained to the Better Business Bureau, approximately $1,000 of the warranty/service contract cost was refunded. (*Id.* at 56.)

{¶ 30} From February 2013 until January 2014, White did not drive the Impala, because it needed a catalytic converter. (*Id.* at 43.) He stored the vehicle in his cousin's

garage; White was not charged to store the vehicle. (*Id.* at 43-44.) White testified that he sold the Impala to his father in January 2014, and that his father had paid the remaining balance on the vehicle loan, which was approximately $9,000. (*Id.* at 39, 41.) Between July 2012 and January 2014, White had made monthly loan payments of $243 to MidUSA. (*Id.* at 47-48.)

**B. White's Evidence**

{¶ 31} White opposed Smedley's motion for summary judgment, providing numerous documents, many of which are the same as the exhibits discussed at his deposition. White also submitted Smedley's responses to his first set of interrogatories, White's credit application with MidUSA, service invoices for work performed by Smedley's on six occasions (July 5, 2012; July 19, 2012; August 13, 2012; October 3, 2012; November 12, 2012; January 21, 2013), White's credit report, trade-in estimates for the Impala, a printout of BBB complaints against Smedley's, printouts of case law, and Smedley's response to White's first request for production of documents. White also provided two CDs with photos, video, and audio recordings. He further provided a sworn verification that his statement of facts were true to the best of his knowledge and belief.[1]

{¶ 32} According to White, he saw an Impala at Smedley's as he was on his way to another dealership, Auto Expressions. White test drove the Impala with a salesperson. After they returned, White met the used car sales manager, Dan Johnson.

---

[1] Smedley's did not move to strike or otherwise object to White's evidence in the trial court. Accordingly, Smedley's has waived any error in the consideration of White's evidence in ruling on the summary judgment motion. *See, e.g., Davenport v. Big Brothers & Big Sisters of Greater Miami Valley, Inc.*, 2d Dist. Montgomery No. 23659, 2010-Ohio-2503, ¶ 41, fn. 6, citing *Darner v. Richard E. Jacobs Group, Inc.*, 8th Dist. Cuyahoga No. 89611, 2008-Ohio-959, ¶ 15; *A-M.R. v. Columbus City Sch. Dist.*, 2015-Ohio-3781, 41 N.E.3d 489, ¶ 16 (10th Dist.).

White states that Johnson "was in high pressure mode, wanting to sale [sic] this car to Plaintiff, so that he would not buy the car he was on his way to negotiate for." White drove back and forth between the two dealerships, "hoping this would work to his advantage and make the other dealership lower its price on the other car." White states that Auto Expressions agreed to drop its price from $14,500 to $13,500; White submitted an unidentified handwritten note to substantiate that statement (Plaintiff's Ex. I.).

{¶ 33} According to White's statements of facts, Johnson made various statements to induce White to purchase Smedley's Impala that day. Johnson agreed to beat Auto Expression's price by $500, he agreed to pay $3,500 for White's trade-in, and Johnson asserted that the car was a better value and that "someone is going to snatch that car up real soon." White stated that he told Johnson that he wanted to think about the car overnight, but Johnson pressured him, offering to "throw in a bumper to bumper warranty" for $1,500 rather than the usual $2,000 cost. White stated that, "[a]fter considering what I thought was a pretty good deal, I finally agreed to the terms of what we had discussed." White stated that the process took about 3 hours.

{¶ 34} White stated that he signed a document that Johnson presented and then waited about 30 minutes while the finance office prepared the paperwork. White indicated that, during those 30 minutes, he transferred his personal belongings from his trade-in vehicle and a Smedley's employee switched his license plates. When White went to the finance office, he "signed papers, not actually paying close attention or reading the paperwork * * *. As it goes on and I just sign where she tells me to and she puts it in an envelope and hands it to me and I take it and walk out of the office."

{¶ 35} White stated that he noticed several problems with the car as he drove it

home. He looked over the paperwork when he got home and was "shocked" to find that it did not reflect the agreement he had discussed with Johnson.

{¶ 36} White stated that he returned the next morning and told Johnson that he wanted to rescind the purchase; White states that Johnson responded. "Well you bought the car now, so it's your problem." White states that Johnson eventually stated that Smedley's would do "whatever it takes to make this right" and "fix whatever needs to be fixed." White stated that Johnson went into the office and returned with revised paperwork (which increased the trade-in value), but it did not reflect the oral agreement.

{¶ 37} White stated that the vehicle has had numerous problems, and his statement of facts asserts that the problems are consistent with a vehicle that has been in a flood.

{¶ 38} Plaintiff's Ex. E, one of the CDs, contained close-up photographs of various parts of the car and a video of the Impala running, showing the service notices on the dashboard and the sound of the vehicle while running. Plaintiff's Ex. G, the second CD, contained audio recordings of several telephone calls between White and various employees of Smedley's; the conversations primarily relate to White's cancellation of his warranty and vehicle repairs.

## IV. Summary Judgment Analysis

{¶ 39} White's complaint alleged three causes of action, which we will address in turn.

## A. Price Shifting

{¶ 40} In his first cause of action, White alleged that Smedley's engaged in price-shifting by not selling the Impala for the orally agreed-upon price.

**{¶ 41}** "[P]arties to contracts are presumed to have read and understood them and * * * a signatory is bound by a contract that he or she willingly signed." *Preferred Capital, Inc. v. Power Engineering Group, Inc.*, 112 Ohio St.3d 429, 2007-Ohio-257, 860 N.E.2d 741, ¶ 10.

> Even when there is misrepresentation by one party of the contents of an agreement, the agreement is not void for fraud in the factum when the signer has an opportunity to read and understand the documents before execution. A person of ordinary mind cannot say that he or she is misled into signing an agreement that is different from the agreement the person intended to sign, when that person could have ascertained what agreement he was entering into by merely reading it when he signed it. If a person can read and is not prevented from reading what he signs, then he alone is responsible for his omission to read what he signs.

(Citations omitted.) *W.K. v. Farrell*, 167 Ohio App.3d 14, 2006-Ohio-2676, 853 N.E.2d 728, ¶ 20 (2d Dist.).

**{¶ 42}** In this case, there is no genuine issue of material fact that White was presented with various sales documents, including a purchase agreement, Buyer's Guide, Warranty Disclaimer, As Is Dealer Warranty Disclaimer, the 3 Day Used Vehicle Exchange Policy, the Limited Right to Cancel – Purchase, Delivery Report, the Odometer Disclosure Statement (Def.'s Ex. I), and a Promissory Note and Disclosure Statement with MidUSA. The purchase agreement and the Promissory Note and Disclosure Statement both itemized the cost of the vehicle, taxes, trade-in value, and fees associated with the purchase. The documents also indicated that White was purchasing the Impala

"as is." The Buyer's Guide expressly stated, "AS IS – NO WARRANTY. You will pay all costs for any repairs. The dealer assumes no responsibility for any *repairs regardless of any oral statements about the vehicle.*" (Emphasis added.)

{¶ 43} White signed each of these documents, and he repeatedly acknowledged that he chose not to read them before signing. White explained his failure to read them by stating that he trusted Smedley's to complete the documents in accordance with their oral agreement and that he did not pay close attention. White presented no evidence that Smedley's prevented him or discouraged him from reading the documents or that Smedley's told him that the terms of the documents would not apply to him.

{¶ 44} Having elected not to read the sales and financing documents, White cannot now argue that Smedley's did not honor the price to which it allegedly had orally agreed. The trial court did not err in granting summary judgment to Smedley's on White's claim of price shifting.

### B. Unscrupulous Sales Tactics and Misrepresented Products

{¶ 45} In his second cause of action, White claimed that Smedley's engaged in unscrupulous sales tactics and misrepresented products. He alleged that Smedley's used high pressure tactics to push him to purchase a "lemon" and that Smedley's misrepresented that the vehicle was in good condition and pressured him to buy a "worthless warranty." He further alleged that Smedley's failed to disclose preexisting damage and to repair problems that it had agreed to repair. White asserted that Smedley's caused additional damage to the vehicle.

{¶ 46} Construing the evidence in the light most favorable to White, White has failed to create a genuine issue of material fact that Smedley's engaged in unscrupulous

sales tactics when it sold the vehicle to him. White's deposition testimony and statement of facts indicate that White was contemplating the purchase of an Impala from two dealerships on June 25, 2012, and that he drove the Impalas to the other dealership in an effort to negotiate the best deal from both dealerships. White's statement of facts in his memorandum in opposition to summary judgment expressly states that White "drove the car [Smedley's Impala] to the other dealership, really hoping this would work to his advantage and make the other dealership lower its price on the other car and it worked, the other dealership lowered its price."

{¶ 47} According to the proposed sales agreement from Auto Expressions (Plaintiff's Ex. I), the Auto Expressions Impala had approximately 15,000 less mileage (63,788) than Smedley's Impala (78,089), but Auto Expressions was offering its Impala for $14,500, with an extended service contract of $1,495, documentary fee of $200, and sales tax of $1,133.65; with the title fee, the total cost would have been $17,343.65. White stated that Auto Expressions reduced its price to $13,500 in response to White's interest in Smedley's Impala, and he offered a handwritten note on blank paper stating that an "07 Impala SS 13,995" was "negotiated to $13,5K to bargain price of Smedley's offering." (Plaintiff's Ex. I); the note does not indicate who wrote the note, when the note was written, and whether that 2007 Impala was located at Auto Expressions. There is no documentation from Auto Expressions reflecting White's negotiations.

{¶ 48} White's evidence reflects that, in response to the knowledge that White was contemplating the purchase of an Impala from another dealership, Johnson tried to induce White to purchase Smedley's Impala asking what he needed to do to get White to buy from Smedley's. According to White, Johnson told White that other customers were

looking at Smedley's Impala, and Johnson offered incentives to make the deal more attractive than Auto Expression's, such as by offering a reduced price on the vehicle, a trade-in for the car, and a reduced price on a warranty. Johnson urged White to buy the Impala that day.

{¶ 49} White stated at oral argument that he remembered only one test drive on June 25, 2012. However, his deposition testimony and statement of facts both indicate that he drove Smedley's Impala on two occasions prior to the purchase. He drove the vehicle once with an employee and a second time by himself for 20 to 30 minutes; White indicated that the second test drive was to Auto Expressions. White stated in his deposition that he informed the salesperson at Smedley's that the brakes shook badly when pressed. The evidence reflects that, at the time of purchase, White was aware of one potential problem with the vehicle, and there is no evidence that Smedley's was aware of additional problems yet failed to disclose them. White has not identified any evidence that Smedley's caused additional damage to the vehicle at any time.

{¶ 50} According to White, after about three hours, he believed he had reached a "pretty good deal" with Smedley's. Construing the evidence in White's favor, White has failed to demonstrate the existence of a genuine issue of material fact regarding his negotiations with Smedley's, and we conclude, as a matter of law, that Smedley's was entitled to summary judgment on White's claim that it engaged in unscrupulous behavior when it sold the vehicle to White.

{¶ 51} White further claims that Smedley's represented that it would repair certain items, but failed to do so. White purchased the Impala "as is," and he signed documents explaining that "as is" meant that Smedley's would assume "no responsibility for any

repairs regardless of any oral statements about the vehicle" (Def.'s Ex. E.), and that the vehicle was being sold without any warranty (Def.'s Ex. F.)

{¶ 52} According to the second purchase contract, however, Smedley's sold the Impala to White subject to the Vehicle Delivery Report, which was attached (Def.'s Ex. D). The Vehicle Delivery Report indicated that Smedley's had agreed to provide certain services, namely: (1) run ozone in vehicle, (2) replace pinstripes on fender, (3) repair moon roof, (4) reclean vehicle, and (5) provide one key fob. The "We Owe" document, dated June 26, 2012, reiterated this obligation. (Def.'s Ex. M.) Both the Vehicle Delivery Report and "We Owe" document stated that the repair obligation was valid for 30 days. White acknowledged that Smedley's attempted to repair the moon roof and that Smedley's corrected the pinstripe on the front fenders. Although there is no evidence that Smedley's made all of the additional repairs to which it agreed, White has presented no evidence that he brought his vehicle to Smedley's for those repairs within 30 days of June 26, 2012.

{¶ 53} Next, White alleges that Smedley's pressured him to purchase a "worthless warranty." He states that Johnson had said it would be a "bumper to bumper warranty." According to the GWC Warranty Contract Application, White selected a "comprehensive" plan for the term of 36 months or 38,000 miles with a $100 deductible. White stated at his deposition that Smedley's salesperson talked him into getting a warranty, but he presented no evidence that Smedley's used unscrupulous sales tactics to induce the purchase of a GWC warranty. White acknowledged at his deposition that he could have declined the warranty, and his testimony reflected that he considered the GWC warranty because the car was being sold "as is."

{¶ 54} The only evidence before us regarding the terms of the GWC warranty is the GWC Warranty Contract Application. That document does not detail what is covered by GWC's "comprehensive" warranty, but makes clear that White was contracting with GWC and was agreeing to various terms and conditions included in that company's extended service contract. White repeatedly stated that he did not read the documents presented by Smedley's, and he could not rely on Johnson's representation that the GWC warranty was "bumper to bumper."

{¶ 55} Finally, although not specifically raised by White, White has not presented evidence that Smedley's engaged in improper practices by presenting him with a second purchase contract and Vehicle Delivery Report, which White asserts were signed on June 26, the day after he took possession of the vehicle. There was no evidence that the original purchase agreement was cancelled and that White should have been presented with a complete new set of purchase documents. Accepting White's evidence as true, White returned to Smedley's on June 26 and asked to rescind his purchase, but Johnson told him that Smedley's would not agree to that. White's evidence demonstrates that, as an accommodation to White, Smedley's agreed to increase the trade-in value and to repair certain items. There is no suggestion by White or otherwise that the purchase documents he signed on June 25 no longer applied.

{¶ 56} Moreover, the documents that White signed on June 25 reflected that White had no right to rescind the purchase on June 26. The 3-Day Used Vehicle Exchange policy generally allowed a buyer to return the purchased used vehicle, within three days and for any reason, and receive a credit toward another Smedley's vehicle. However that document expressly stated that "'As Is' vehicles are EXCLUDED and DO NOT

CARRY the Exchange Offer." The Limited Right to Cancel document permitted the parties to cancel the sale if White's financing fell through; the evidence reflects that White's financing through MidUSA was approved. Accordingly, there is no evidence that Smedley's was obligated to allow White to return the Impala and cancel their agreement.

{¶ 57} Upon review of the evidence, the trial court properly granted summary judgment to Smedley's on White's claims of unscrupulous sales tactics.

### C. Breach of Contract and Ohio Consumer Sales Practices Act

{¶ 58} White's third cause of action alleged breach of contract and violations of the Ohio Consumer Sales Practices Act. White's breach of contract claim reiterates the allegations in his first and second causes of action. For the reasons stated above, the trial court properly granted summary judgment for breach of contract.

{¶ 59} The Ohio Consumer Sales Practices Act prohibits unfair or deceptive or unconscionable acts or practices in connection with consumer transactions. R.C. 1345.02; R.C. 1345.03. "[T]he CSPA defines 'unfair or deceptive consumer sales practices' as those that mislead consumers about the nature of the product they are receiving, while 'unconscionable acts or practices' relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue." *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791.

{¶ 60} Deceptive acts or practices include:

(a) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;

(b) That a specific price advantage exists, if it does not;

(c) That a consumer transaction involves or does not involve a warranty, a

disclaimer of warranties or other rights, remedies, or obligations if the representation is false.

R.C. 1345.02(B)(2), (8), (10). In determining whether a particular act or practice is unconscionable, the following circumstances must be taken into account:

(1) Whether the supplier has knowingly taken advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement;

(2) Whether the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers;

(3) Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;

(4) Whether the supplier knew at the time the consumer transaction was entered into that there was no reasonable probability of payment of the obligation in full by the consumer;

(5) Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;

(6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment;

(7) Whether the supplier has, without justification, refused to make a refund in cash or by check for a returned item that was purchased with cash or by check, unless the supplier had conspicuously posted in the establishment at the time of the sale a sign stating the supplier's refund policy.

R.C. 1345.03(B).

{¶ 61} White asserts that Smedley's actions in connection with his purchase of the Impala violated the OCSPA, but he does not identify the specific subsection that Smedley's violated. Considering the evidence presented in the trial court and construing it in the light most favorable to White, we find no evidence to support a conclusion that Smedley's misled White about the nature of the product he received (the Impala) or that Smedley's manipulated his understanding of the nature of their transaction. The trial court did not err in granting summary judgment to Smedley's on White's OCSPA claim.

{¶ 62} At oral argument, White also asserted that Smedley's violated the Magnuson-Moss Warranty Act, 15 U.S.C. 2301, et seq., and various provisions of the Ohio Administrative Code. White did not raise these additional allegations before the trial court, and we will not consider them.

### V. Conclusion

{¶ 63} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

FAIN, J., and HALL, J., concur.

Copies mailed to:

Saylor White
Michael C. Mahoney
Sean A. Graves
Stephen V. Freeze

Hon. Cynthia M. Heck