[Cite as *Fordyce v. Hattan*, 2019-Ohio-3199.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| SETH FORDYCE, et al. | : | |
| | : | |
| Plaintiffs-Appellants | : | Appellate Case No. 28342 |
| | : | |
| v. | : | Trial Court Case No. 2016-CV-5856 |
| | : | |
| KENNETH M. HATTAN, et al. | : | (Civil Appeal from |
| | : |  Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 9th day of August, 2019.

. . . . . . . . . .

BARRY W. MANCZ, Atty. Reg. No. 0011857, 2160 Kettering Tower, Dayton, Ohio 45423
     Attorney for Plaintiffs-Appellants

STEPHEN E. KLEIN, Atty. Reg. No. 0014351 and PATRICK J. JANIS, Atty. Reg. No.
0012194, 124 W. Main Street, Troy, Ohio 45373
     Attorneys for Defendants-Appellees

. . . . . . . . . . . .

HALL, J.

{¶ 1} The plaintiffs-appellants, Seth Fordyce and Fordyce Finishing Company, LLC, appeal the trial court's entry of summary judgment for the defendants-appellees, Kenneth Hattan and Acquisition Services, LLC, on the appellants' claims for misrepresentation. We conclude that there was no justifiable reliance and that the claims were barred by the applicable statute of limitations, and we affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 2} This case involves the sale of a business and the seller's claim that his broker misrepresented to him the terms of the sale. The business was Fordyce Finishing Company, LLC, owned by Seth Fordyce. (We will refer to them collectively as "Fordyce.") Fordyce hired Kenneth Hattan and his company, Acquisition Services, LLC, to be his agent in the sale. (We will refer to them collectively as "Hattan.") Hattan found a buyer in Couch Business Development, Inc., and its owner David Couch. (We will refer to them collectively as "Couch.")

### The negotiations

{¶ 3} On April 1, 2010, Hattan faxed Fordyce an exclusive right-to-sell agency agreement for Fordyce to sign. Two months later, on June 21, Couch sent Fordyce a letter of intent to purchase Fordyce's business for $1.9 million. The letter, which had been drafted by Couch's attorney, provided that Fordyce would agree to provide consulting services for six months after the closing—the first 280 hours at no cost to Couch and additional hours at $50 per hour. The letter further provided that Fordyce would agree to "take up to a 15% financial holdback position as required by the lending institution."

Fordyce had his attorney, Michael Sandner, review the letter and then Fordyce signed it.

{¶ 4} Couch then used the letter of intent to apply for a loan from Huntington National Bank. Huntington at first rejected Couch's application, but later the bank sent Hattan and Couch an email telling them that the loan application would be reconsidered if, among other things, Fordyce agreed to finance $515,000 of the purchase price and to sign a full-term standby agreement that would preclude Fordyce from accepting payments from Couch until Huntington's loan was paid in full. There is no dispute that Hattan told Fordyce about the first requirement, but there is a dispute as to whether Hattan told him about the full-term standby agreement.

{¶ 5} In September, Huntington sent Couch a Commitment Letter agreeing to lend him $1,128,000 over 16 years. Fordyce signed a "Statement of Seller's Intent to Finance," stating that he was willing to finance up to $515,000 of the sale over a term of 10 years and that he was "willing to sign a 'Stand-by Agreement' in favor of bank financing provided." Fordyce did not have his attorney review the Statement of Intent.

{¶ 6} At the same time, Fordyce's attorney and Couch's attorney were drafting, reviewing, and revising several other agreements relating to the sale, including an Asset Purchase Agreement (APA) and a Consulting Agreement. Sometime after September 15, but before the closing, Fordyce and Couch signed the APA, which provided that $515,000 of the $1.9 million purchase price would be paid by a promissory note "payable upon such terms and conditions to comply with the Purchaser's banks' requirements." (Article 1.3(a)). The APA further provided that for six months after closing, Fordyce, under a Consulting Agreement attached to the APA, would provide 280 hours of consulting services at no cost and any additional hours at a rate of $35 per hour. (Article 9). The

Consulting Agreement was not attached to the APA.

*The closing and post-closing*

**{¶ 7}** The closing occurred on November 19, 2010. Fordyce, Hattan, and Couch were present, but neither Fordyce's nor Couch's attorney was. Couch signed a promissory note to Huntington for $1,128,000. He also signed a promissory note to Fordyce (Seller Note) for $515,000, plus interest, which included this provision:

> This Note shall be subordinate to the Promissory Note of the Huntington National Bank and shall be payable upon the Promissory Note to Huntington National Bank being paid in full, and the Maker shall make monthly installments of $10,000 of principal and interest which shall be paid on the 1st day of each month beginning thirty (30) days from the date that the Promissory Note to Huntington National Bank has been paid in full, and shall continue to be paid until the entire unpaid principal balance and accrued interest has been paid in full.

A draft of the Seller Note was reviewed by Fordyce's attorney, and Fordyce read the Seller Note at the closing. For his part, Fordyce signed a "Standby Creditor's Agreement," referred to in the Statement of Intent that he had signed earlier. In the Standby Agreement, Fordyce agreed, among other things:

> 1. To accept no further payments on the Standby Loan until Lender's Loan is satisfied[.]
>
> * * *
>
> 3. To take no action to enforce claims against Standby Borrower on the Standby Loan until Lender's Loan is satisfied.

\* \* \*

8. Additional Loans made by Standby Creditor will be subject to the terms of this Agreement, unless Lender agrees otherwise in writing[.]

{¶ 8} More than a week after the closing, Fordyce and Couch signed the Consulting Agreement referred to in the APA.[1] The agreement contained the same consulting terms as the APA but added a payment of $515,000:

(A) COUCH shall pay FORDYCE at the rate of Thirty Five Dollars and 00/100 ($35.00) per hour in excess of the Two Hundred (280) hours included in the Asset Purchase Agreement in Article 9.

(B) COUCH shall additionally pay Consultant Five Hundred Fifteen Thousand Dollars and 00/100 ($515,000.00), payable as follows:

(1) No payment shall be required due (sic) until the twenty fifth month from the date of this Agreement.

(2) The annual payment to FORDYCE shall not exceed 10% of gross sales of COUCH, unless at the sole discretion of COUCH.

(3) Notwithstanding, the entire balance of the consulting fee shall be paid with interest thereon at three and nine tenths percent (3.9%) per annum, paid on or before the 18th day of November, 2020.[2]

(4) The entire principal balance may be paid at any time without

---

[1] Like the date on the APA, the date on the Consulting Agreement (November 19, 2010) does not reflect the date that the agreement was actually signed. In an email that Hattan sent Couch on December 1, 2010, Hattan says that he will see Fordyce the next day and that he (Hattan) has "copies of the consulting agreement for signing."

[2] This date is six years before the maturity date of the Huntington Note.

penalty.

According to Couch, the $515,000 payment in the Consulting Agreement was intended to replace the $515,000 promissory note. The agreement was created by the joint efforts of Fordyce's attorney (Sandner) and Couch's attorney. There were various drafts of this document reviewed and revised by Sandner on behalf of Fordyce. Fordyce believes that the Consulting Agreement was part of the sale, but he does not know why it was signed separately from the other sale documents. Hattan was not involved in drafting the Consulting Agreement. Hattan exchanged information between Fordyce and Couch but was not consulting with Fordyce, Couch, or their attorneys about the terms of the agreement.

**{¶ 9}** Couch understood the Consulting Agreement violated the bank's Standby Agreement. He said that the agreement was a "work-around" substitute for the $515,000 note in order to provide payment to Fordyce before the 16-year note to Huntington Bank was paid. Couch's attorney told him this was not unusual and that the agreement could be structured to comply with the bank agreement. According to Couch, he, Fordyce, and their attorneys all knew that the Consulting Agreement was a "work around" of the bank limitations. On October 18, 2010, Fordyce's attorney, Sandner, sent Fordyce an e-mail about the agreement in which he told Fordyce: "If it is a ten year agreement then paragraph 2 has a significant typo (It identifies it as a two year agreement). You don't get any money until after two years, and may not get much of anything at that time." Fordyce understood Sandner to mean that he was to begin receiving monthly payments after two years.

**{¶ 10}** The Seller Note was never cancelled, and the existence of the Consulting

Agreement was not disclosed to Huntington.

{¶ 11} In the six months that followed the closing, Fordyce provided the 280 hours of consulting services required by the APA and Consulting Agreement. Two years after the closing, Couch began making payments to Fordyce under the Consulting Agreement. But the following year, Couch experienced financial difficulties and began making interest-only payments. These payments, totaling around $70,000, were reflected in financial documents provided to Huntington in 2014. When Huntington saw these payments, it immediately told Couch that the payments were in violation of the Standby Agreement and that if they were not stopped, Huntington would file suit. The next month, Couch stopped making the payments to Fordyce.

*Fordyce sues*

{¶ 12} On November 16, 2016, Fordyce filed suit against Hattan for negligent and fraudulent misrepresentation and for return of the commission that it had paid him. Hattan moved to join Couch and Huntington as necessary parties. The motion was unopposed and the parties were joined. Hattan filed a counterclaim and third-party claims against the newly-joined parties for declaratory relief as to the interpretation and effect of the Seller Note, Huntington Note, Standby Agreement, and Consulting Agreement.

{¶ 13} Huntington filed a motion for summary judgment on Hattan's claims for declaratory relief, and Hattan filed a motion for summary judgment on Fordyce's claims. Hattan argued that there was no genuine dispute that Fordyce's reliance on Hattan's alleged misrepresentations and concealments of fact was not justified. Hattan further argued that there was no genuine dispute that Fordyce was not damaged by his reliance on any alleged misrepresentations and concealments of fact. Finally, Hattan argued that

Fordyce's claims were not brought within the four-year statute of limitations. In response, Fordyce argued that Hattan's status as an agent and fiduciary imposed a duty to disclose the material facts of the sale, in particular the full-term standby creditor's agreement, and that his failure to do so rendered the agreements relating to the sale fraudulent. Fordyce further argued that his reliance on Hattan's alleged misrepresentations and concealments of fact was justified. Finally, Fordyce argued that his claims were brought within four years of his discovery of Hattan's alleged misrepresentations and concealments of fact.

{¶ 14} The trial court granted Huntington's summary-judgment motion and dismissed Hattan's claims against it. The court also granted Hattan's summary-judgment motion and entered judgment against Fordyce.

{¶ 15} Fordyce appeals.

## II. Analysis

{¶ 16} Fordyce presents a single assignment of error for our review:

The Trial Court erred in sustaining Defendants Hattans' Motion for Summary Judgment and dismissing Plaintiffs' Complaint.

Fordyce challenges the trial court's conclusions on justifiable reliance and the statute of limitations.

{¶ 17} Summary judgment should be entered when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C); *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 375 N.E.2d

46 (1978). We review a trial court's entry of summary judgment de novo. *Kooyman v. Staffco Constr., Inc.*, 189 Ohio App.3d 48, 2010-Ohio-2268, 937 N.E.2d 576, ¶ 13 (2d Dist.).

## A. No justifiable reliance

{¶ 18} In order to prevail on a claim for negligent or fraudulent misrepresentation, a plaintiff must prove justifiable reliance. *Baker v. Northwest Hauling*, 6th Dist. Wood No. WD-02-050, 2003-Ohio-3420, ¶ 17; *see also Ajibola v. Ohio Med. Career College, Ltd.*, 2d Dist. Montgomery No. 27975, 2018-Ohio-4449, ¶ 15, 31. "Reliance is justifiable if the representation does not appear unreasonable on its face and if there is no apparent reason to doubt the veracity of the representation under the circumstances." *AmeriFirst Sav. Bank v. Krug*, 136 Ohio App.3d 468, 495, 737 N.E.2d 68 (2d Dist.1999). Justifiable reliance, as contrasted with reasonable reliance, " 'is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.' " *Id.* at 496, quoting *Field v. Mans*, 516 U.S. 59, 70-71, 133 L.Ed.2d 351, 116 S.Ct. 437 (1995). In determining whether there was justifiable reliance, "the court must inquire into the relationship between the parties. * * * The court must consider the nature of the transaction, the form and materiality of the representation, the relationship of the parties and their respective means and knowledge, as well as other circumstances." (Citations omitted.) *Mishler v. Hale*, 2014-Ohio-5805, 26 N.E.3d 1260, ¶ 33 (2d Dist.). While justifiable reliance is a question of fact, summary judgment is appropriate where the factual materials, construed in the plaintiff's favor, do not support a finding of justifiable reliance. *Id.* at ¶ 33, 37.

{¶ 19} Fordyce alleges that Hattan misrepresented when payment on the Seller's Note would begin. Fordyce says that he expressed concern to Hattan over the terms of the Standby Agreement and that Hattan reassured him that the Standby Agreement was a mere formality and that payment on the Seller Note would commence two years after the closing, despite the clear, unequivocal prohibition against such payments in the Seller Note and Standby Agreement. Fordyce says that Hattan told him that if payment did not begin, he (Fordyce) could take action to enforce his claims against Couch. Fordyce maintains that he relied on Hattan's misrepresentation. But Hattan says that he told Fordyce only that typically a lender in Huntington's position would do one of three things: refinance its loan after two years and pay off the seller's loan, permit payments to be made on the seller's loan under a payment schedule, or permit payments to be made when the borrower's balance sheet improved. At any rate, says Hattan, Fordyce should not have relied on his representations.

{¶ 20} There is no dispute that several documents contradicted Hattan's representations and that Fordyce signed two of them. Fordyce signed the Asset Purchase Agreement, which stated that Couch would execute a promissory note "payable upon such terms and conditions to comply with the Purchaser's banks' requirements." Fordyce also accepted Couch's promissory note (Seller Note), which states that it "shall be subordinate to the Promissory Note of the Huntington National Bank and shall be payable upon the Promissory Note to Huntington National Bank being paid in full." Moreover, Fordyce signed the Standby Creditor's Agreement, in which Fordyce agreed "[t]o accept no further payments on the Standby Loan until Lender's Loan is satisfied" and agreed "[t]o take no action to enforce claims against Standby Borrower on the Standby Loan until

Lender's Loan is satisfied." Given this evidence, reasonable minds could conclude only that Fordyce was not justified in relying on Hattan's representations as to when payment on the Seller's Note would begin.

{¶ 21} Before signing, Fordyce had a duty to read the documents and understand the terms to which he would be bound. *Compare Mishler*, 2014-Ohio-5805, 26 N.E.3d 1260, at ¶ 36 (saying, in determining justifiable reliance, that it was significant that the defendant, a licensed real estate salesperson, "had a duty to read the document he signed and understand that he was bound by its terms"). "[P]arties to contracts are presumed to have read and understood them and * * * a signatory is bound by a contract that he or she willingly signed." *Preferred Capital, Inc. v. Power Eng. Group, Inc.*, 112 Ohio St.3d 429, 2007-Ohio-257, 860 N.E.2d 741, ¶ 10. "A person of ordinary mind cannot say that he or she is misled into signing an agreement that is different from the agreement the person intended to sign, when that person could have ascertained what agreement he was entering into by merely reading it when he signed it. If a person can read and is not prevented from reading what he signs, then he alone is responsible for his omission to read what he signs." (Citations omitted.) *W.K. v. Farrell*, 167 Ohio App.3d 14, 2006-Ohio-2676, 853 N.E.2d 728, ¶ 20 (2d Dist.); *White v. Smedley's Chevrolet*, 2d Dist. Montgomery No. 26637, 2016-Ohio-968, ¶ 41 (quoting the same). It is a "legal and common-sensical axiom that one must read what one signs." *ABM Farms v. Woods*, 81 Ohio St.3d 498, 503, 692 N.E.2d 574 (1998). There is no evidence here that Fordyce could not read the documents or that he was prevented from reading them.

{¶ 22} While there was a principal-agent relationship between Fordyce and Hattan, Fordyce knew that Hattan was not an attorney, which is why Fordyce had his attorney,

Sandner, review and revise many of the sale documents. Sandner explicitly warned Fordyce about the risk posed by the provision in the Seller Note that subordinated the note to the bank loan, pointing out that payment of the Seller Note "is only conditionally due upon payment to Huntington." (September 16, 2010 Letter). Sandner also explained the possible consequences: "If payment to Huntington is never made, payments never commence under your Note. This presents a serious risk to you, as technically a default on the note to Huntington will not only preclude you from being paid, but will preclude you from being able to claim that those amounts are due." Sandner told Fordyce that "[a]s this is a significant issue, I think we should discuss." Despite this warning from his attorney, Fordyce chose to proceed with the deal.

{¶ 23} Given the circumstances in this case—particularly that Fordyce signed two documents that plainly stated that no payment on the Seller Note would be made until the bank was fully paid and that his attorney pointed out to him this risk—we conclude that Fordyce was not justified in relying on contrary representations by Hattan, assuming that they were made as claimed by Fordyce.

## B. The statute of limitations has expired.

{¶ 24} Given our conclusion that Fordyce did not prove justifiable reliance, we need not consider whether the statute of limitations on Fordyce's claims has run, but we nevertheless do so briefly.

{¶ 25} Fordyce does not dispute that Hattan's alleged misrepresentations occurred, at the latest, on the closing date, November 19, 2010. Nor does Fordyce dispute that his misrepresentation claims were subject to a four-year statute of limitations. *See* R.C. 2305.09(C) and (D); *Luburgh v. Bishop*, 2d Dist. Montgomery No. 25818, 2014-Ohio-

236, ¶ 10, fn. 1 (negligent misrepresentation); *Kudukis v. Mascinskas*, 8th Dist. Cuyahoga No. 81663, 2003-Ohio-1355, ¶ 15 (fraudulent misrepresentation). Fordyce commenced this action in 2016. We agree with the trial court that for each misrepresentation claim the limitations period began on November 19, 2010, and expired four years later in November 2014.

*The claim for negligent misrepresentation*

{¶ 26} A cause of action for negligent misrepresentation accrues, and the limitations period begins to run, when the misrepresentation is made. *Luburgh* at ¶ 10, fn. 1; *Flagstar Bank v. Airline Union's Mtge. Co.*, 128 Ohio St.3d 529, 2011-Ohio-1961, 947 N.E.2d 672, ¶ 27 ("A cause of action for professional negligence accrues when the act is committed."). Here, Hattan's alleged misrepresentations occurred, at the latest, on November 19, 2010. Clearly, the four-year limitations period had expired on Fordyce's claim for negligent misrepresentation.

*The claim for fraudulent misrepresentation*

{¶ 27} Because the discovery rule applies to claims for fraudulent misrepresentation, a cause of action accrues, and the limitations period begins to run, when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered the fraud. *Luburgh* at ¶ 14, citing *Investors REIT One v. Jacobs*, 46 Ohio St.3d 176, 546 N.E.2d 206 (1989), paragraph 2(b) of the syllabus. "When determining whether the exercise of reasonable diligence should have discovered a case of fraud, the relevant inquiry is whether the facts known 'would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry * * *.' " *Cundall v. U.S. Bank*, 122 Ohio St.3d 188, 2009-Ohio-2523, 909 N.E.2d 1244, ¶ 29, quoting *Hambleton v. R.G. Barry Corp.*, 12

Ohio St.3d 179, 181, 465 N.E.2d 1298 (1984). As the Ohio Supreme Court has said, " 'the standard requires only facts sufficient to alert a reasonable person of the *possibility* of fraud.' " (Emphasis sic.) *Id.* at ¶ 30, quoting *Palm Beach Co. v. Dun & Bradstreet*, 106 Ohio App.3d 167, 171, 665 N.E.2d 718 (1st Dist.1995). " '[*C*]*onstructive* knowledge of facts, rather than *actual* knowledge of their legal significance, is enough to start the statute of limitations running under the discovery rule.' " (Emphasis sic.) *Id.*, quoting *Flowers v. Walker*, 63 Ohio St.3d 546, 549, 589 N.E.2d 1284 (1992).

{¶ 28} Here, Fordyce, through the exercise of reasonable diligence, should have discovered the fraud, at the latest, at the closing on November 19, 2010. Before the closing, Hattan told Fordyce that payments on the Seller Note would begin two years after the closing. At the closing, Hattan told Fordyce the same thing. But Fordyce knew that the Asset Purchase Agreement, Seller Note, and Standby Agreement all said that there would be no payment on the Seller Note until the bank loan was paid. The conflict between Hattan's representations (and the Consulting Agreement) and the Asset Purchase Agreement, Seller Note, and Standby Agreement was sufficient to lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry into when payment would begin. Fordyce should have discussed the conflict in the documents with his attorney.

### III. Conclusion

{¶ 29} The trial court did not err by granting summary judgment for Hattan. The sole assignment of error is overruled, and the trial court's judgment is affirmed.

. . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.


Copies sent to:

Barry W. Mancz
Stephen E. Klein
Patrick J. Janis
Wilburn L. Baker
Jeffrey J. Madison
Hon. Steven K. Dankof