[Cite as *Kern v. Mishler*, 2025-Ohio-1698.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# LOGAN COUNTY

MIKE KERN,                                    CASE NO. 8-24-38

    PLAINTIFF-APPELLANT,

  V.

MARK MISHLER, ET AL.                          OPINION AND
                                              JUDGMENT ENTRY
    DEFENDANTS-APPELLEES.


Appeal from Logan County Common Pleas Court
Trial Court No. CV 23 04 0074

Judgment Affirmed

Date of Decision:  May 12, 2025


APPEARANCES:

    *Zachary D. Maisch* for Appellant

    *Glen R. McMurry* for Appellee

**ZIMMERMAN, J.**

{¶1} Plaintiff-appellant, Mike Kern ("Kern"), appeals the judgments of the Logan County Court of Common Pleas granting (partial) summary judgment in favor of defendants-appellees, Mark Mishler ("Mishler"), Tecumseh Landing LLC ("Tecumseh Landing"), Shooting Star Estates ("Shooting Star"), and Indian Isles Investments LLC ("Indian Isles") (collectively, "defendants"), entering judgment on the jury's verdict, and granting the defendants' motion for attorney fees. For the reasons that follow, we affirm.

{¶2} This case arose from a disputed business relationship between Kern and Mishler, which began in 2002-2003 with real estate transactions near Indian Lake, Ohio. Kern alleged that he and Mishler had an (oral) partnership that persisted over the years, encompassing properties titled under Mishler's sole-member limited liability companies—Tecumseh Landing, Indian Isles, Shooting Star, and a property in Russells Point, Ohio. Kern claimed that he was entitled to a share of income and proceeds from these assets. Mishler, however, denied any ongoing partnership, asserting that Kern served only as an independent contractor, managing properties and performing maintenance in exchange for free boat storage, and that Kern held no ownership interest in the properties at issue. The dispute escalated when Mishler sold certain properties without sharing proceeds with Kern.

{¶3} Litigation concerning the parties' business relationship commenced in October 2020, but that case was voluntarily dismissed to allow the parties to reach an amicable agreement. Because no such agreement was reached, Kern filed a new complaint (along with a request for a lis pendens) in the trial court on April 3, 2023, alleging claims for breach of fiduciary duty, unjust enrichment, breach of contract, and civil conspiracy against the defendants and Jeffrey Eversman ("Eversman"). Eversman filed a Civ.R. 12(B)(6) motion to dismiss on April 21, 2023.

{¶4} Thereafter, on May 12, 2023, Kern filed an amended complaint (along with a request for a lis pendens), alleging claims for breach of fiduciary duty for accounting and asset distribution failures, unjust enrichment for labor contributions, and breach of an oral contract for equal equity and proceeds in partnership real estate. On May 25, 2023, Kern dismissed Eversman as party to the case without prejudice.

{¶5} On May 18, 2023, Kern moved the trial court for a preliminary injunction, or, in the alternative, to join additional necessary parties. On June 5, 2023, the defendants filed a memorandum in opposition to Kern's request for injunctive relief or to join necessary parties. The trial court denied Kern's request for injunctive relief or to join necessary parties on June 12, 2023.

{¶6} Also on May 18, 2023, the defendants filed a Civ.R. 12(B)(6) motion to dismiss Kern's complaint. Kern filed a memorandum in opposition to the motion to dismiss on June 16, 2023. On June 23, 2023, the defendants filed their reply to

Kern's memorandum in opposition to their motion to dismiss. On June 29, 2023, the trial court denied the defendants' motion to dismiss Kern's complaint, but granted the motion as to the request for the lis pendens.

{¶7} On July 13, 2023, the defendants filed an answer along with counterclaims for fraud, trespass, tortious interference with a business relationship, tortious interference with a contract, unjust enrichment, breach of contract, breach of fiduciary duty, and civil conspiracy. Kern filed an answer to the defendants' counterclaims on August 8, 2023.

{¶8} On September 15, 2023, the defendants filed a motion for summary judgment as to Kern's complaint as well as their counterclaims for fraud, trespass, tortious interference with a business relationship, tortious interference with a contract, unjust enrichment, and breach of contract. Kern filed a memorandum in opposition to the defendants' motion for summary judgment on October 13, 2023. The defendants filed their reply to Kerns' memorandum in opposition to their motion for summary judgment on October 20, 2023.

{¶9} However, notwithstanding the issues raised by the defendants, the trial court, on October 9, 2023, directed the parties to submit arguments regarding the applicability of the statute of limitations as to Kern's claims. On October 16, 2023, Kern responded, contending that his claims were timely under either a four- or six-

year statute of limitations, as the defendants sold assets after 2014.[1] The defendants filed their response the following day, arguing that, regardless of whether Kern's claims were subject to a four- or six-year statute of limitations, they were time barred since he alleged that they accrued before 2014.

{¶10} On October 26, 2023, the trial court granted the defendants' motion for summary judgment and dismissed Kern's complaint, concluding that his claims were barred by the applicable statute of limitations. The trial court reasoned that Kern possessed knowledge of the alleged wrongs with the defendants well before 2020, rendering his claims untimely under either a four- or six-year statute of limitations. Relevantly, the trial court cited Kern's affidavit, emails from 2009-2010, and other evidence showing his awareness of property transactions, alleged wrongs, income, expenses, and Mishler's sole ownership claims as early as 2003. Importantly, the trial court determined that Kern's early knowledge triggered the statute of limitations. The trial court reasoned that, even under the six-year statute of limitations (which was in effect prior to a 2021 amendment), Kern's claims should have been filed by 2009. Since Kern did not file until 2020, the trial court determined that his claims were time-barred. Furthermore, the trial court denied the defendants' motion for summary judgment as to their breach of contract counterclaim and dismissed that counterclaim.

---

[1] Notably, the parties entered into a tolling agreement wherein Kern voluntarily dismissed his initial complaint, filed on October 26, 2020, without prejudice, to facilitate settlement negotiations.

{¶11} On January 5, 2024, the defendants filed a motion requesting that the trial court sanction Kern under Civ.R. 37 for failing to comply with discovery obligations. Kern filed a memorandum in opposition to the defendants' motion for sanctions on January 12, 2024. On January 22, 2024, the defendants filed their reply to Kern's memorandum in opposition to their motion for sanctions. On February 14, 2024, the trial court issued an order compelling disclosure of the requested information and deferred ruling on sanctions.

{¶12} On March 8, 2024, the defendants filed a motion advising the trial court of Kern's non-compliance with the order compelling disclosure. Consequently, on March 12, 2024, the trial court issued an order prohibiting Kern from presenting evidence at trial related to his affirmative defenses to the defendants' remaining counterclaims. Following Kern's motion for reconsideration of the March 12, 2024 order, the trial court reconsidered and permitted him to present evidence regarding his affirmative defenses, but ordered him to pay the defendants' attorney fees. On May 8, 2024, the defendants filed a motion notifying the trial court of Kern's continued non-compliance with the discovery order and requested that the trial court sanction Kern.

{¶13} On May 15-17, 2024, the matter proceeded to a jury trial on the defendants' remaining counterclaims. At trial, Mishler testified that he met Kern when they were neighbors in Dayton, Ohio, in 1998. Kern introduced Mishler to the Indian Lake region. Mishler testified that he is the sole owner of properties

acquired in 2002 and 2003, held in single-member limited liability companies: Tecumseh Landing, Indian Isles, and Shooting Star. Mishler relocated to New Jersey shortly after acquiring the investment properties.

{¶14} Mishler unequivocally stated that Kern holds no ownership interest in these properties or the associated limited liability companies. While Kern proposed a partnership or equity agreement in 2010 via email, Mishler testified that no such agreement was ever formalized. Importantly, Mishler testified that Kern rejected a proposed partnership agreement that would have required him to invest capital.

{¶15} Instead, Mishler permitted Kern to store personal items on the properties in exchange for Kern's assistance with property access and inspections. Mishler testified that this arrangement was not a grant of authority for Kern to operate a boat rental business. Notwithstanding their agreement, Mishler testified that he learned in 2015 (from other tenants) that Kern was using a mobile home on the property for personal storage without permission.

{¶16} Moreover, Mishler testified that he discovered Kern was operating a boat rental business on his properties in 2015. However, his full awareness of the extent of the operation did not occurr until 2020. He testified that Kern operated a lucrative boat rental business on his property, profiting $1,434,980.00 without authorization between 2016 and 2020. Furthermore, Mishler presented evidence that Kern intercepted tenant rent payments under the guise of "bogus repairs," without performing the repairs. (May 15, 2024 Tr. at 182). According to Mishler,

Kern was intercepting the rent monies prior to 2018. In October 2016, Mishler instructed one of his tenants to disconnect the electricity because it was the off season but the tenant responded that Kern was "still running the store." (*Id.* at 168). According to Mishler, when he confronted Kern about it, Kern openly acknowledged his unauthorized operation of the store.

{¶17} Mishler further testified that Kern executed unauthorized leases, including one in 2018 with Robert Neely ("Neely"), who was, in reality, a paid employee of Kern. That is, Mishler later learned that Neely was not the actual tenant, it was Kern. Mishler testified that Kern threatened Neely with eviction but that he resolved the situation by executing a release with Neely from rental obligations without Mishler's authority or consent.

{¶18} Kern also subdivided a building to create a brewery, which paid little to no rent. As part of the brewery business, Kern hired a plumber without authorization, resulting in a mechanic's lien against Mishler's property, which Mishler was forced to pay. Even though Kern had no authority to execute these business deals, Mishler reasoned that it would be more burdensome to unwind Kern's actions than to simply honor them. Following the termination of Neely's lease, Mishler regained control of the properties through his attorneys.

{¶19} Mishler testified that his business suffered because "the most lucrative part of the Tecumseh Landing lease is the boat rentals. And [he] found out that Mr. Kern was running his boat business through [Mishler's] assets and that made the

lease a lot less attractive. So that's what caused high turnover with tenants because they were missing out on the gravy that they were entitled to." (*Id.* at 173).

**{¶20}** Mishler testified that when he listed the properties for sale in 2020, Kern filed a lawsuit, which interfered with potential buyers. Kern denied potential buyers access to the property and sent a "threatening letter" to one buyer, claiming ownership and threatening legal action. The delay in the sale of the real estate caused Mishler to lose $28,144.00 in carrying costs, including property taxes, license fees, Bureau of Underground Storage Tank Regulations ("BUSTR") fees, insurance, and utilities, between 2020 and 2023.

**{¶21}** On cross-examination, Mishler clarified that, while he became fully aware of Kern's unauthorized boat rental business operating *from* his property in 2020, he had known Kern was renting boats prior to that. He specifically testified that he "knew he rented boats, but not on [Mishler's] property." (*Id.* at 211). That is, Mishler emphasized the distinction: he was unaware Kern was utilizing *his specific property* for this enterprise.

**{¶22}** Mishler also confirmed his involvement in a separate real estate venture with Kern and two other individuals at Long Island, Indian Lake in 2003. He further testified to a transaction involving a property on Main Street, Russells Point, Ohio, acquired through Indian Isles. Mishler stated he sold this property to Kern, receiving a promissory note in lieu of cash. However, Kern did not pay the note.

{¶23} Finally, Mishler confirmed his 2002 purchase of an A-frame home in Huntsville, Ohio, asserting that Kern had no ownership interest in that property. He further stated that he sold the A-frame in 2019. Moreover, Mishler testified that he sold the Tecumseh Landing property for the same amount in 2023 that he negotiated in 2020.

{¶24} Vernon Christman ("Christman"), a long-time member of the Indian Lake community and owner of Bud's Marine, testified on behalf of the defendants. He provided evidence regarding the attempted and completed sale of Tecumseh Landing and Kern's interference with that sale. Christman testified that he negotiated the purchase of Tecumseh Landing with Mishler in 2020. However, the sale was disrupted by Kern in January 2021 when he received a certified letter from Kern's attorney. The letter, dated January 15, 2021, notified Christman of Kern's lawsuit and his objection to the sale. Christman testified that Kern was not involved in any aspect of the sale negotiations. Based on his extensive knowledge of the Indian Lake community, Christman testified that Kern had a poor reputation in the area. He further stated that he never believed Kern had any ownership interest in Tecumseh Landing.

{¶25} The sale of Tecumseh Landing was eventually completed in April 2023. However, Christman testified that he has been unable to transfer the liquor license associated with the property. He attributed this difficulty to Kern's behavior.

Christman asserted that Kern obtained the liquor license by falsely claiming ownership of Tecumseh Landing.

{¶26} On cross-examination, Christman testified that he did not feel personally threatened by the letter from Kern's attorney. Christman stated that he did not directly request Kern to transfer the liquor license. He reasoned that he had no need to communicate with Kern, as Kern was never involved in the sale negotiations. Christman testified that he believed the liquor license would automatically transfer to him upon his completion of the property sale with Mishler.

{¶27} The defendants called Eversman, the customer service manager for Bud's Marine, who previously worked for Kern. His testimony provided insight into Kern's operations at Tecumseh Landing and Kern's interactions with the property. Specifically, Eversman testified that he initially believed Kern owned Tecumseh Landing. However, he later learned that Kern was not the owner and that Neely was a tenant. This realization came after Eversman received rent payments from Neely, paid in cash. Eversman's understanding of Neely's role shifted when he witnessed Kern providing Neely with the cash to pay the rent. Neely subsequently admitted to Eversman that he was receiving the rent money from Kern.

{¶28} Eversman testified that Kern operated a boat rental company and fuel dock from the Tecumseh Landing property. However, he observed that Kern did not perform any maintenance on the property, which was in a state of disrepair. Eversman further stated that he never saw Kern use rent money for repairs.

{¶29} Eversman learned Mishler's identity in 2021, after Kern filed his lawsuit. Eversman testified that he assisted Mishler in changing locks and installing security cameras on the property when both Mishler and Kern were prohibited from entering. Eversman then witnessed Kern breaking the new locks and entering the property. Eversman observed Kern enter the property and retrieve tools, leftover inventory (soda and snacks), and a bar stool. He emphasized that Kern, not Neely, retrieved these items, despite Neely being the purported business operator.

{¶30} Kern testified in his defense, asserting the existence of an oral partnership with Mishler. Specifically, Kern asserted that he and Mishler formed an oral partnership, where Kern's responsibilities included rent collection and Mishler's involved accessing the bank account. Kern stated that he and Mishler discussed formalizing the partnership in writing around 2009 or 2010. Kern testified to receiving 25 percent of the sale proceeds from the Long Island property.

{¶31} Further, Kern stated he leased the gas station and convenience store at Tecumseh Landing and paid Mishler rent. He further admitted to paying Neely's rent and employing him to manage the convenience store, gas pumps, and boat rentals. Kern asserted that Neely's name was on the lease to facilitate direct vendor dealings.

{¶32} Kern claimed to have paid various expenses for the real estate businesses. But, he testified that he did not always ask Mishler for reimbursements. Kern further claimed to have offset expenses against rent payments, explaining the

unpaid $5,580 rent (from Neely's purported tenancy) as a result of property-related purchases and repairs.

**{¶33}** Kern testified that Mishler knew he was renting boats from the property in 2016. Kern testified to representing the companies in court for rent collection on three occasions; identified exhibits demonstrating that he signed documents on behalf of Tecumseh Landing as a partner or managing member; and represented that he applied for a zoning permit for a property he believed he owned with Mishler.

**{¶34}** Kern denied owning the brewery but admitted to signing the lease as the managing member of Tecumseh Landing. He claimed to have obtained the liquor license as the managing member of Tecumseh Island, paying for it through his own limited liability company, MK Ventures, LLC, because Mishler did not want to undergo a background check. Kern further stated he paid $8,000 or $9,000 to settle the mechanic's lien.

**{¶35}** On cross-examination, Kern conceded that he is not a member of Tecumseh Landing, Indian Isles, or Shooting Star. Importantly, Kern acknowledged the absence of having any payment records, citing cash transactions and lost bank receipts. Indeed, Kern failed to present any concrete evidence of the expenses he claimed to have incurred.

**{¶36}** Outside of the Neely lease, Kern admitted to operating Tecumseh Landing without a formal lease, relying on an "oral collaboration" or partnership without a contract. (May 16, 2024 Tr. at 210). Kern further admitted to paying Neely's rent despite Neely being listed as the tenant, confirming that Neely was his employee. However, Kern testified that Mishler was aware of the arrangement because Mishler prepared the lease.

**{¶37}** Kern's testimony regarding the plumbing bill was challenged with an email in which he described the venture as "personal," contradicting his claim of partnership. (*Id.* at 226). According to Kern, he called it a personal venture to get the plumbers to do the work.

**{¶38}** On re-direct examination, Kern testified that he sent all documents that he signed as "managing member" to Mishler. He testified that he sought to formalize the partnership in writing during the Cole Ward litigation, which was commenced in 2009. He stated he released Neely from the lease due to threats of a lawsuit from the defendants.

**{¶39}** On May 17, 2024, the jury returned a verdict in favor of the defendants on their claims for fraud, trespass, tortious interference with a business relationship, and unjust enrichment but found in Kern's favor as to the defendants' civil conspiracy claim. The jury awarded the defendants $1,463,124.00 ($478,326.00 as to the fraud claim; $478,326.00 as to the trespass claim; $28,144.00 as to the tortious interference with a business relationship claim; and $478,328.00 as to the unjust

enrichment claim) in damages. Upon a finding of intentional conduct by Kern, the jury reconvened on the issue of punitive damages and awarded the defendants $1,500,000.00 in punitive damages and attorney fees. On May 20, 2024, the trial court entered judgment in favor of the defendants for $2,963,124.00 plus attorney fees.

{¶40} On June 7, 2024, the defendants moved for attorney fees in the amount of $303,506.55, costs of $14,814.21, prejudgment interest of $925,396.20, and post-judgment interest from May 17, 2024. Kern filed a memorandum in opposition to the defendants' motion for attorney fees on June 28, 2024. On July 3, 2024, the trial court awarded the defendants $303,506.33 in attorney fees, $14,814.21 in costs, and $395,026.71 in prejudgment interest, for a total judgment in the amount of $713,347.25. The trial court ordered post-judgment interest to accrue at the statutory rate from the date of the entry awarding attorney fees.

{¶41} On June 13, 2024, Kern moved for a judgment notwithstanding the verdict as to damages or, in the alternative, for a new trial or remittitur on the issue of damages. The defendants filed a memorandum in opposition to Kern's motion on June 27, 2024. The trial court denied Kern's motion on July 1, 2024.

{¶42} Kern filed his notice of appeal on July 30, 2024. He raises four assignments of error for our review.

**First Assignment of Error**

**The trial court erred in granting Appellees' motion for partial summary judgment and dismissing Appellant's complaint.**

{¶43} In his first assignment of error, Kern argues that the trial court erred by granting partial summary judgment in favor of the defendants as to his claims and by dismissing his amended complaint after determining that his claims were barred by the statute of limitations. Kern contends that the trial court's determination that his amended complaint was barred by the statute of limitations was improper because the defendants' motion sought dismissal just on the ground that no partnership existed, not on statute of limitations grounds, and the trial court raised this issue sua sponte, ordering additional briefing. Even if it were properly raised, Kern argues that the trial court overlooked breaches after October 26, 2016—such as the 2019 A-frame sale and 2023 Tecumseh Landing sale—which the defendants conceded were within the four-year limitations period.

*Standard of Review*

{¶44} We review a decision to grant summary judgment de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390 (2000). "De novo review is independent and without deference to the trial court's determination." *ISHA, Inc. v. Risser*, 2013-Ohio-2149, ¶ 25 (3d Dist.), citing *Costner Consulting Co. v. U.S. Bancorp*, 2011-Ohio-3822, ¶ 10 (10th Dist.). Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter

of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994).

**{¶45}** "The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact." *Carnes v. Siferd*, 2011-Ohio-4467, ¶ 13 (3d Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). "In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument." *Id.*, citing *Dresher* at 292. "The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; he may not rest on the mere allegations or denials of his pleadings." *Id.*, citing *Dresher* at 292 and Civ.R. 56(E).

*Analysis*

**{¶46}** As an initial matter, Kern argues that the trial court's decision granting partial summary judgment in favor of the defendants as to his claims and dismissing his amended complaint was improper since the defendants did not seek dismissal on statute of limitations grounds. We are not persuaded by this argument. Instead, based on the specific facts and circumstances presented by this case, we conclude that the trial court did not err by granting summary judgment in favor of the defendants on statute of limitations grounds even though the defendants did not raise

-17-

the statute of limitations issue in their motion for summary judgment. *See Baker v. Brocker*, 1995 WL 152497, *2-3 (7th Dist. Mar. 31, 1995).

**{¶47}** It is a general principle that "[a] party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond." *Mitseff v. Wheeler*, 38 Ohio St.3d 112 (1988), syllabus. However, "[a] court may grant summary judgment sua sponte 'so long as the losing party was on notice that [it] had to come forward with all of [its] evidence.'" *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 892 (10th Cir. 1997), quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). *See also Zimpfer v. Roach*, 2017-Ohio-8437, ¶ 46 (3d Dist.) (acknowledging that "a trial court has the inherent authority to manage its own proceedings and control its own docket" to ensure the fair and efficient administration of justice). Likewise, it is the precedent of this court that a trial court may consider evidence outside of the complaint when considering a motion to dismiss, so long as the trial court provides the parties notice and a reasonable opportunity to present all of the evidence permissible under Civ.R. 56(C). *See, e.g.*, *Sullinger v. Sullinger*, 2020-Ohio-5225, ¶ 12 (3d Dist.).

**{¶48}** In this case, it was not error for the trial court to consider the statute of limitations issue when deciding the propriety of summary judgment. Importantly, the defendants raised the affirmative defense of the statute of limitations in their answer. Furthermore, and crucially, the trial court provided both parties explicit

-18-

notice and a full opportunity to brief and argue the statute of limitations issue. This afforded Kern due process and the ability to present all evidence and legal arguments in his favor, satisfying the requirements for a court to consider issues sua sponte at the summary judgment stage. Therefore, the trial court's decision to address the statute of limitations issue, even though not initially raised in the defendants' motion, was proper.

**{¶49}** Having established the propriety of the trial court's consideration of the applicability statute of limitations, we now address Kern's specific arguments regarding its application. "The statute of limitations to be applied is determined from the essential ground or gist of the complaint." *Bd. of Edn. of Loveland City School Dist. v. Bd. of Trustees of Symmes Twp.*, 2018-Ohio-1731, ¶ 30 (1st Dist.). Considering the gist of Kern's action, the statute of limitations applicable to claims for breach of fiduciary duty (R.C. 2305.09) provides that such claim must be brought within four years after the cause of action accrued. While, the statute of limitations applicable to claims for unjust enrichment and breach of an (oral) contract (R.C. 2305.07) originally provided that such claims must be brought within six years after the causes of action accrued. However, R.C. 2305.07 was amended in 2021 and now provides for a four-year statute of limitations. *See Gozion v. Cleveland School of the Arts Bd. of Trustees*, 2024-Ohio-1991, ¶ 17 (8th Dist.). While the parties presented conflicting arguments regarding the precise statute of

limitations, the trial court resolved the dispute by applying a four-year limitation period, a decision Kern does not contest on appeal.

**{¶50}** Instead, Kern argues that the trial court erred by granting partial summary judgment in favor of the defendants as to the sale of the A-frame in 2019 and Tecumseh Landing in 2023, contending that these transactions occurred within the applicable limitations period. The defendants dispute Kern's argument and contend that Kern's focus on the sale dates disregards the crucial determination of when Kern's claims accrued under the discovery rule.

**{¶51}** Based on our review of the record, we conclude that the trial court did not err by granting partial summary judgment in favor of the defendants as to Kern's amended complaint because Kern's claims for breach of fiduciary duty, unjust enrichment, and breach of contract are barred by the relevant statutes of limitations. In its entry granting partial summary judgment in favor of the defendants as to Kern's claims, the trial court determined that Kern had knowledge, or should have had knowledge, of potential claims against the defendants as early as 2003. Consequently, the trial court concluded that Kern's failure to initiate legal action within the applicable statute of limitations barred his claims when he filed suit in 2020.

**{¶52}** "As a general rule, a cause of action accrues at the time the wrongful act is committed." *Chateau Estate Homes, LLC v. Fifth Third Bank*, 2017-Ohio-6985, ¶ 13 (1st Dist.). "An exception to the general rule is the discovery rule." *Id.*

-20-

"It provides that a cause of action does not arise until the plaintiff knows, or by the exercise of reasonable diligence should know, that he or she has been injured by the defendant's conduct." *Id.* *See also Bonner v. Delp*, 2021-Ohio-3772, ¶ 43 (6th Dist.) ("Ohio courts have explained that under the discovery rule, where there has been a claim of fraud, the 'cause of action accrues, and the limitations period begins to run, when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered the fraud.'"), quoting *Fordyce v. Hattan*, 2019-Ohio-3199, ¶ 27 (2d Dist.). For the purpose of the discovery rule, the accrual of a cause of action begins when a party possesses constructive knowledge of facts that would induce a reasonably prudent person to conduct further inquiry. *Meehan v. Mardis*, 2019-Ohio-4075, ¶ 29 (1st Dist.). Actual, comprehensive knowledge is not necessary to initiate the running of the statute of limitations. *Id.*

{¶53} To successfully assert a statute of limitations defense, the defendant bears the initial burden of establishing that the plaintiff's claim is time-barred. *Lyons v. Farmers Ins. Group of Cos.*, 67 Ohio App.3d 448, 450 (3d Dist. 1990). However, if a plaintiff invokes the discovery rule as an exception to the statute of limitations, the burden shifts to the plaintiff to prove its applicability. *Ault v. Jasko*, 1993 WL 46658, *3 (9th Dist. Feb. 24, 1993).

{¶54} No genuine issue of material fact exists regarding the accrual of Kern's claims. Determinately, the evidence demonstrates that Kern possessed, or should

have possessed, knowledge of the factual basis for his claims well before the subject property sales.

{¶55} Regarding Kern's breach of fiduciary duty claim, predicated on alleged accounting and asset distribution failures, the applicable statute of limitations commenced upon Kern's actual or constructive knowledge of these breaches. Importantly, such breaches would have occurred at the time of the alleged accounting discrepancies or improper asset distributions, not at the subsequent sale of the properties. Indeed, the purported partnership between Kern and Mishler commenced as early as 2002 or 2003. This early inception (by Kern) of the partnership is crucial in analyzing Kern's knowledge and the accrual of his claims. In other words, from the very beginning of this alleged partnership, Kern would have had the opportunity, and a reasonable expectation, to receive accounting documentation from Mishler. By failing to receive regular and transparent accounting records over the course of nearly two decades, Kern was placed on constructive, if not actual, notice that Mishler was not fulfilling his alleged fiduciary duties. A reasonable partner, exercising ordinary diligence, would have inquired about the lack of accounting documentation and taken steps to address the issue.

{¶56} Therefore, Kern cannot now claim that he only discovered these alleged breaches at the time of the property sales. The protracted period during which he failed to receive accounting documentation, coupled with his active involvement in the alleged partnership, precludes him from relying on the discovery

rule to delay the commencement of the statute of limitations as to his breach of fiduciary duty claim.

{¶57} Similarly, Kern's unjust enrichment claim, stemming from labor contributions, accrued at the time said labor was performed. That is, the sale of the properties is irrelevant to the determination of this accrual. Importantly, in his complaint, Kern's own admissions of managing the properties commencing in 2002 or 2003, signing leases, representing the partnership in legal proceedings, and acting as an uncompensated property manager demonstrate his direct knowledge of the labor performed. Stated another way, Kern was not a passive party, but an active participant in the management and operation of the properties. Therefore, Kern had actual knowledge of the accrual of his unjust enrichment claim from the moment each service was performed.

{¶58} Furthermore, any argument that Kern believed he would be compensated for his labor upon the eventual sale of the properties is decisively belied by the evidence underlying his breach of fiduciary duty claim. Specifically, Kern's failure to demand or receive any accounting documentation from Mishler over the entire duration of the alleged partnership undermines any assertion that he reasonably expected a future lump-sum payment. Importantly, if Kern truly believed he was entitled to compensation upon the sale of the properties, he would have, at the very least, demanded regular accounting records to track the financial performance of the partnership and ensure accurate calculation of his share. His

prolonged silence and inaction in demanding such documentation demonstrate a lack of reasonable expectation of future compensation.

{¶59} In sum, Kern's continuous involvement from 2002 or 2003 with the properties, coupled with his failure to seek accounting information, signals that he was aware of any alleged unjust enrichment as it occurred. Kern's actions demonstrate that he was not relying on a future event for compensation, but rather acquiescing to the lack of immediate payment. Therefore, the statute of limitations has long since expired for any labor performed outside the applicable statutory period and Kern cannot credibly claim delayed discovery or reliance on a future event for compensation.

{¶60} Finally, Kern's breach of contract claim, concerning equal equity and proceeds, accrued when distributions inconsistent with the alleged agreement commenced, not at the time of the property sales. In particular, lack of formal ownership, financial discrepancies, and Mishler's unilateral actions placed Kern on notice of any potential breaches. Importantly, Kern's failed attempts to formalize the partnership in 2009 or 2010 indicate his awareness that the oral agreement was insufficient. Accordingly, based on Kern's active involvement, attempts to formalize a partnership agreement, and access to financial information, supports that he knew or should have known of potential breaches of the alleged oral partnership agreement well before the statute of limitations period expired. Therefore, Kern's breach of contract claim is time-barred.

{¶61} Consequently, based on our review of the facts and circumstances presented, it is evident that Kern failed to meet his burden of proof of establishing the applicability of the discovery rule. Critically, Kern did not provide sufficient evidence to demonstrate that he neither knew nor should have known of the accrual of his claims until the sale of the properties. Therefore, Kern's claims are time-barred by the applicable statutes of limitations, as he failed to establish a genuine issue of material fact regarding the accrual of his claims or the applicability of the discovery rule. Thus, we conclude that the trial court did not err by granting partial summary judgment in favor of the defendants as to Kern's claims and by dismissing his amended complaint.

{¶62} Kern's first assignment of error is overruled.

### Second Assignment of Error

**The trial court erred when it improperly charged the jury on punitive damages.**

{¶63} In his second assignment of error, Kern challenges the trial court's jury instruction on punitive damages, arguing that the trial court's definition of actual malice was defective.

*Standard of Review*

{¶64} "'A determination as to which jury instructions are proper is a matter left to the sound discretion of the trial court, and thus, a trial court's formulation of the instructions is upheld absent an abuse of discretion.'" *Triad Hunter, LLC v.*

*Eagle Natrium, LLC*, 2024-Ohio-5188, ¶ 102 (7th Dist.), quoting *B & B Contrs. & Developers, Inc. v. Olsavsky Jaminet Architects, Inc.*, 2012-Ohio-5981, ¶ 101 (7th Dist.). *See also Ward v. Geiger*, 2006-Ohio-6853, ¶ 36 (3d Dist.) ("A trial court has discretion in determining the precise language to include in its instructions to the jury."). An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶65}** "However, it is the trial court's duty to include in its instructions a correct, clear, and complete statement of the law." *Brown v. Senor Gringo's, Inc.*, 2010-Ohio-985, ¶ 45 (3d Dist.). "Ambiguity in jury instructions does not constitute reversible error unless the jury was probably misled 'in a matter materially affecting the complaining party's substantial rights.'" *Ward* at ¶ 36, quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208 (1990)

**{¶66}** Nevertheless, because Kern did not object to the trial court's jury instruction on punitive damages, he has waived all but plain error on appeal. The plain-error doctrine is not favored in appeals of civil cases. *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus. It "may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Id.* The plain error doctrine applies to

unobjected, prejudicial errors that are clear and would substantially undermine the integrity and public perception of judicial proceedings. *Dobie v. Dobie*, 2022-Ohio-237, ¶ 17 (3d Dist.).

*Analysis*

**{¶67}** In Ohio, punitive damages are recoverable in tort actions where the plaintiff establishes, by clear and convincing evidence, fraud, actual malice, or insult. *Gibbons v. Shalodi*, 2021-Ohio-1910, ¶ 52 (9th Dist.); *Burns v. Prudential Secs., Inc.*, 2006-Ohio-3550, ¶ 98 (3d Dist.). *See also* R.C. 2315.21. Punitive damages serve to punish and deter egregious conduct, not to compensate the plaintiff. *Burns* at ¶ 98. To warrant punitive damages, conduct must exceed mere negligence. *Id.* The jury retains exclusive authority to determine the amount of punitive damages. *Id.*

**{¶68}** Punitive damages based on malice require proof of actual malice and resulting actual damages. *Id.* at ¶ 99. Actual malice is defined as: (1) hatred, ill will, or revenge, or (2) conscious disregard for others' rights and safety with a high probability of substantial harm. *Id.* at ¶ 102. It requires a wrongful act without plausible legal justification and a positive element of conscious wrongdoing. *Long v. Mt. Carmel Health Sys.*, 2017-Ohio-5522, ¶ 29 (10th Dist.). Actual malice may be inferred from reckless, wanton, willful, or gross conduct, as direct proof is rarely available. *Burns* at ¶ 103. Importantly, "'a positive element of conscious

wrongdoing is always required.'"  *Id.* at ¶ 102, quoting *Preston v. Murty*, 32 Ohio

St.3d 334, 335 (1987).

{¶69} In this case, the trial court gave both oral and written instructions to

the jury.  At trial, the trial court verbally instructed the jury on punitive damages:

> I will prepare and send back a short set of instructions.  But to begin the deliberation process, let me tell you first that it is not mandatory for you to issue a punitive damages award.  He's entitled to your consideration.  Whether you do so is within the same amount of judgment that you have.
>
> . . .
>
> You account of the amount that you think is necessary to be a punishment for the nature of the conduct. You'll see that there needs to be an actual malice finding.  There needed to be an intent on [Kern's] part to commit the unlawful acts.
>
> If we think of accidents happening by a bad judgment, that's not what actual malice is.  Malice would be the defendant intending to cause harm.  And, again, the intent of cause harm you've already found because you found that he did commit intentional conduct, but you have found it by this lesser standard, preponderance.  In the future, the actual malice, the intent, is by more evidence.

(May 17, 2024 Tr. at 81-82).

> In the written jury instruction, the trial court instructed the jury:
>
> In order for the Defendants to prevail on their claim for punitive damages, they must prove that Mike Kern:
>
> (A) acted with malice; or
> (B) acted with aggravated or egregious fraud.
>
> "Malice" means: (A) a state of mind characterized by hatred, ill will, or a spirit of revenge; or (B) a conscious disregard for the rights and

safety of another person that has a great probability of causing substantial harm.

(Ct. Ex. 6).

**{¶70}** Upon reviewing the entirety of the jury instructions, we conclude that the trial court's instruction regarding actual malice for punitive damages, while perhaps not exhaustive, was a correct statement of the law. "'A standard general jury charge which sets forth, in substance, the relevant law adequately informs the jury of the proper legal standards, absent evidence requiring a more specific instruction.'" *Booth v. Duffy Homes, Inc.*, 2008-Ohio-5261, ¶ 42 (10th Dist.) (French, J., concurring in part and dissenting in part), quoting *Ballard v. Wal-Mart Stores, Inc.*, 1999 WL 8353, *2 (12th Dist. Jan. 11, 1999). "Even where the trial court's instruction is not a full and comprehensive statement of the law, its use is not reversible error as long as it correctly states law pertinent to the issues in the case." *Id.* "Misstatements in a portion of the instruction will not constitute reversible error unless the instructions are so misleading that they prejudicially affect a substantial right of the complaining party." *Id.* In this case, the trial court's punitive damages instruction, when considered in its entirety, did not mislead the jury.

**{¶71}** Critically, even assuming without deciding that the trial court's punitive damages instruction on actual malice was defective, Kern has failed to demonstrate any prejudice. *Accord Lloyd v. Thornsbery*, 2021-Ohio-239, ¶117

-29-

(11th Dist.) (resolving that the absence of a prejudice argument in a jury instruction challenge is fatal). Indeed, Kern did not provide a substantive analysis illustrating how the alleged instructional error directly impacted the jury's punitive damages award. In fact, he offered no evidence or reasoned argument to suggest that, absent the purported defect, the jury would have reached a materially different outcome. Consequently, Kern has not discharged his burden of proving that the alleged defects in the actual malice instruction affected the jury's determination of punitive damages. *See Children's Hosp. Med. Ctr. v. S. Lorain Merchants' Assn.*, 2006-Ohio-2407, ¶ 8 (9th Dist.).

{¶72} Moreover, our review of the record demonstrates that the defendants presented detailed arguments to the jury, thoroughly documenting the presence of actual malice in Kern's conduct. Similarly, our review of the record reflects that the evidence presented at trial independently supports a finding of actual malice, further validating the jury's decision. Specifically, the evidence presented at trial demonstrated that Kern's conduct was inspired by actual malice, characterized by hatred, ill will, a desire for revenge, or a conscious disregard for the defendants' rights and interests. Indeed, at trial, evidence was presented reflecting that Kern operated a lucrative boat rental business on the defendants' property without permission, generating over $1.4 million in personal gains. This blatant disregard for the defendants' ownership rights and a deliberate intent to profit at the defendants' expense reflects actual malice.

{¶73} Moreover, the evidence documented Kern's active concealment of his boat rental business, using a "ghost tenant" to hide his involvement. This blatant deception revealed an intention to mislead and exploit the defendants' trust for his personal gain, a hallmark of actual malice. Furthermore, the evidence demonstrated that Kern intercepted tenant rent payments under the guise of "bogus repairs," further undermining the defendants' business operations and financial interests, and reveals a calculated effort to harm the defendants' legitimate business activities.

{¶74} Likewise, there was evidence presented that Kern neglected the property's maintenance, allowing it to fall into disrepair while profiting from its use. This lack of respect for the defendants' investment and focus solely on personal gain further supports a finding of actual malice. Kern also executed unauthorized leases and agreements, including the brewery lease, which resulted in a mechanics' lien against the defendants' property, further demonstrating a malicious intent.

{¶75} Additionally, evidence was presented that Kern actively interfered with the sale of the property, by denying potential buyers access and by sending a letter threatening a lawsuit to the prospective buyer. Kern's conduct caused the defendants' financial harm and showcased Kern's desire to harm their interests, a clear indication of ill will.

{¶76} Finally, Kern falsely claiming ownership of the property and its liquor license, misleading others, and attempting to exert control over assets that did not belong to him is evidence of his intent to deceive and manipulate for personal gain.

{¶77} In sum, the evidence presented at trial demonstrated that Kern's actions were not merely negligent or careless; they were deliberate, calculated, and motivated by a desire to harm the defendants' interests. Therefore, the evidence presented at trial supports a finding of actual malice. Accordingly, the trial court's punitive damages jury instruction on actual malice does not amount to plain error under the evidence presented.

{¶78} Kern's second assignment of error is overruled.

### Third Assignment of Error

**The trial court erred in awarding attorney fees to defendants.**

{¶79} In his third assignment of error, Kern argues that the trial court erred by awarding the defendants attorney fees. Specifically, Kern argues that the trial court failed to conduct an attorney fee hearing at which Kern could challenge the number of hours billed and the reasonableness of the rates charged.

*Standard of Review*

{¶80} "The decision to award attorney fees and the amount thereof are within the discretion of the trial court." *Technical Constr. Specialties, Inc. v. New Era Builders, Inc.*, 2012-Ohio-1328, ¶ 26 (9th Dist.). Therefore, we review a trial court's determination regarding attorney fees for an abuse of discretion. *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991). Again, an abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

*Analysis*

**{¶81}** "Because Ohio Courts adhere generally to the 'American Rule' regarding attorney fees, prevailing parties may not recover attorney fees unless provided by statute or contract or in the event that punitive damages are awarded." *Estate of Samples v. Lagrange Nursing & Rehab. Ctr., Inc.*, 2024-Ohio-4441, ¶ 19 (9th Dist.). "'When a party is awarded punitive damages, a trial court has the discretion to order the losing party to pay the prevailing party's attorney fees.'" *Id.*, quoting *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, 2020-Ohio-1056, ¶ 1.

**{¶82}** When attorney fees are authorized, "'the amount of such fees is within the sound discretion of the trial court. Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere.'" *Bittner* at 146, quoting *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.*, 23 Ohio App.3d 85, 91 (12th Dist. 1985). When determining the appropriate attorney fees award, "Ohio courts . . . 'are not required to act as "green-eyeshade accountants" and "achieve auditing perfection" but instead must simply . . . do "rough justice."'" *Chapel v. Wheeler Growth Co.*, 2023-Ohio-3988, ¶ 20 (1st Dist.), quoting *Northeast Ohio Coalition for the Homeless v. Husted*, 831 F.3d 686, 703 (6th Cir. 2016), quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011).

**{¶83}** "The Ohio Supreme Court embraces a 'lodestar' approach to attorney fee awards, under which 'the starting point for determining attorney fees is . . . "'the

number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.""""" *Kellard v. Cincinnati*, 2021-Ohio-1420, ¶ 31 (1st Dist.), quoting *Phoenix Lighting Group* at ¶ 10, quoting *Bittner* at 145, quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). To determine a reasonable attorney fee, Ohio courts consider the prevailing market rate in the relevant community, taking into account the complexity of the issues and the attorney's experience. *Phoenix Lighting Group* at ¶ 11. "A trial court may benchmark a reasonable rate 'against rates recently approved for equally experienced attorneys in comparably complex cases.'" *Kellard* at ¶ 31, quoting *State ex rel. Harris v. Rubino*, 2018-Ohio-5109, ¶ 4.

**{¶84}** Based on the parties' submitted briefs, supporting attachments, and affidavits, the trial court entered an award of attorney fees in favor of the defendants in the amount of $303,506.33. Pertinently, the trial court found both the hourly rate and the number of hours expended by the defendants' attorneys to be reasonable and necessary, particularly highlighting Kern's repeated discovery failures and non-compliance with court orders, which significantly increased the defendants' legal work.

**{¶85}** On appeal, Kern challenges the attorney fee award, arguing both that the trial court erred by failing to hold a separate evidentiary hearing to determine the amount of attorney fees, and that the award itself was an abuse of discretion.

**{¶86}** To begin, Kern failed to demonstrate how the lack of a separate hearing prejudiced him. *See Anca v. Anca*, 1996 WL 220891, *3 (2d Dist. May 3, 1996) (resolving that "[t]he appellant has failed to demonstrate how she was prejudiced by the failure of the trial court to provide her a hearing" on the issue of attorney fees). Critically, Kern did not present us with an argument demonstrating how the outcome of the attorney fee award would have been different if a hearing occurred. That is, Kern did not present any evidence demonstrating that the hourly rate applied by the trial court exceeded community norms or that the number of hours expended by the defendants' attorneys was unreasonable. *See Evilsizor v. Alexander*, 1994 WL 117118, *2 (9th Dist. Apr. 6, 1994) (reasoning that a hearing on attorney fees is not required when the court's existing knowledge—derived from itemized billing, pleadings, observation, and familiarity with local fees—is sufficient). Therefore, because Kern has not demonstrated how he was prejudiced by the trial court's failure to hold a hearing on attorney fees, his argument on this point fails.

**{¶87}** Having found that Kern suffered no prejudice from the lack of a hearing, we now turn to the merits of the fee award itself. Based on our review of the record, we conclude that the trial court did not abuse its discretion by awarding the defendants $303,506.33 in attorney fees. Crucially, Kern has failed to provide any evidence demonstrating that the trial court's attorney fee award was unreasonable, arbitrary, or unconscionable. *See Chapel v. Wheeler Growth Co.*,

2023-Ohio-3988, ¶ 24 (1st Dist.). That is, Kern's bare-bones argument that the hourly rate exceeded community norms is unsubstantiated by any supporting evidence. Similarly, his assertion that the number of hours expended was unreasonable is devoid of any specific examples or of factual support. Therefore, since Kern failed to provide any evidence demonstrating that the attorney fee award was unreasonable, arbitrary, or unconscionable, the trial court's award is not an abuse of discretion.

**{¶88}** Kern's third assignment of error is overruled.

**Fourth Assignment of Error**

**The jury's verdict is against the manifest weight of the evidence.**

**{¶89}** In his fourth assignment of error, Kern argues that the jury's $1,463,124.00 compensatory damages award is against the manifest weight of the evidence. Specifically, Kern argues that the jury lost its way in awarding the defendants compensatory damages in the amount of $1,434,980.00, the gross sales from his boat rental business, without offsetting expenses to determine net profit. Kern suggests that the proper measure of damages should have been the rental value of the property, not a share of his business profits.

**{¶90}** Kern also argues that lost profits are not recoverable for a trespass claim and that the jury's $28,144.00 award for tortious interference with a business relationship is against the manifest weight of the evidence because Mishler sold the property for the same price in 2023 as intended in 2020.

*Standard of Review*

**{¶91}** "The standard of review for manifest weight is the same in a civil case as in a criminal case." *Yurkovich v. Kessler*, 2020-Ohio-4169, ¶ 30 (6th Dist.). It "'refers to a greater amount of credible evidence and relates to persuasion.'" *Snapp v. Castlebrook Builders, Inc.*, 2014-Ohio-163, ¶ 85 (3d Dist.), quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. "Under this standard, the reviewing court 'does not reweigh the evidence' but it applies the presumption that the jury's findings of fact are correct." *Id.*, quoting *Southeast Land Dev., Ltd. v. Primrose Mgt. L.L.C.*, 2011-Ohio-2341, ¶ 7 (3d Dist.).

**{¶92}** When applying the manifest-weight standard of review, the reviewing court reviews the entire record, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Eastley* at ¶ 17, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist. 2001). If the evidence can be interpreted in multiple ways, the reviewing court must adopt the interpretation that supports the verdict and judgment, favoring their affirmation. *Guagenti v. Guagenti*, 2017-Ohio-2706, ¶ 53 (3d Dist.).

*Analysis*

**{¶93}** In this case, Kern contends that the jury lost its way by awarding the defendants $1,463,124.00 in compensatory damages. Primarily, Kern argues that

the jury's award of $1,434,980.00, representing the gross sales from his boat rental business, was against the manifest weight of the evidence because it failed to offset his expenses. We disagree. Importantly, the defendants presented a compelling argument at trial that they were entitled to recover Kern's profits from the boat rental business, not merely their own lost profits (in the form of lost rent). This argument was predicated on Kern's operation of the business on Mishler's property without his authorization. In essence, the defendants sought to disgorge Kern of his ill-gotten gains, ensuring that Kern would not profit from his wrongful conduct.

**{¶94}** The purpose of disgorgement, an equitable remedy, is to prevent a wrongdoer from profiting from their illegal or unethical behavior by forcing them to give up any gains. *See Patterson v. United HealthCare Ins. Co.*, 76 F.4th 487, 497 (6th Cir. 2023) ("Disgorgement is an equitable remedy that "deprive[s] wrongdoers of their net profits from unlawful activity.'"), quoting *Liu v. Secs. & Exchange Comm.*, 591 U.S. 71, 79 (2020); *Miller v. Cloud*, 2016-Ohio-5390, ¶ 92 (7th Dist.) (defining "[d]isgorgement . . . as, 'the act of giving up something (such as profits illegally obtained) on demand or by legal compulsion.'"), quoting *Black's Law Dictionary* (10th Ed. 2014). "[D]isgorgement is a remedy for a claim, not a claim for relief itself under Ohio law." *Fahey Banking Co. v. Grady & Assoc.*, 2024-Ohio-159, ¶ 24 (8th Dist.). In sum, "when a party is a wrongdoer disgorgement is an option." *Miller* at ¶ 92.

{¶95} At trial, the parties stipulated that Kern earned $1,434,980.00 in gross sales from the boat rental business. This figure represented the provable sales recorded via Square receipts.[2] Significantly, evidence was presented at trial that Kern's actual profits were likely higher, as the cash sales were not accounted for due to a lack of available receipts. Notwithstanding the parties' stipulated evidence of gross revenues, and the indication of even higher potential earnings, Kern failed to produce any admissible evidence as to his expenses that would offset these profits. This failure was directly attributable to Kern's repeated discovery failures and non-compliance with court orders. By failing to provide evidence of expenses, Kern effectively prevented the jury from precisely calculating his net profits.

{¶96} As to disgorgement, the burden falls upon the wrongdoer to demonstrate any legitimate deductions from their gross profits. *See S.E.C. v. Teo*, 746 F.3d 90, 105 (3d Cir. 2014) (discussing the burden in a disgorgement scenario); *Osborn v. Griffin*, 2016 WL 1092672, *33 (E.D.Ky. Mar. 21, 2016) ("'A claimant who seeks disgorgement of profit has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain. Residual uncertainty in calculating net profit is assigned to the defendant.'"), quoting Restatement of the Law 3d, Restitution and Unjust Enrichment, § 51(5)(d) (2011). Due to Kern's failure to present admissible evidence demonstrating legitimate

---

[2] A Square receipt is a record of a transaction processed through the Square point-of-sale system, often used by small businesses for credit and debit card payments.

deductions from his gross profits, the decision to disregard such deductions was properly within the purview of the jury.

{¶97} In these such cases, the trier of fact "occupies the best position to watch the witnesses and observe their demeanor, gestures and voice inflections and to utilize these observations in weighing credibility." *Sanford v. Griffin*, 2023-Ohio-1917, ¶ 9 (7th Dist.), citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "A reviewing court should not reverse a decision simply because its opinion differs from the finder of fact's opinion concerning the credibility of the witnesses and evidence submitted." *Id.*, citing *Seasons Coal* at 81.

{¶98} Indeed, without actual evidence of expenses, the jury was left to assess Kern's credibility based on his testimony that he had incurred expenses. This credibility assessment, including the weight to be given to Kern's testimony, was squarely within the jury's purview. Consequently, given Kern's evidentiary shortcomings, our review of the record reveals that the jury was presented with evidence of Kern's gross sales and his failure to provide evidence of expenses. Therefore, it was for the jury to accept the defendants' argument for disgorgement of the stipulated profits, and we will not second-guess that assessment. *See Logan v. Holcomb*, 2013-Ohio-2047, ¶ 39 (3d Dist.).

{¶99} In addition to his argument regarding the boat rental profits, Kern argues that the jury's award of $478,326.00, representing a portion of his gross sales in the trespass counterclaim, was improper because lost profits are not recoverable

in a trespass action. The defendants, however, dispute Kern's characterization of this award, asserting that they sought to disgorge Kern's profits resulting from his trespass, rather than claiming their own lost profits. We agree with the defendants' position, as disgorgement of profits derived from a trespass is a recognized and permissible remedy. *See, e.g.*, *In re de Jong*, 793 Fed.Appx. 659, 660 (9th Cir. 2020) ("The Restatements expressly allow for the disgorgement of profits derived from the conscious trespassory use of real property."), citing Restatement, § 40, Comment b, Restatement of the Law 2d, Torts, § 929, Comment c (1979), and Restatement of the Law, Restitution, § 151, Comment f (1937). Thus, Kern's argument is without merit.

{¶100} Finally, Kern alleges that the jury lost its way by awarding the defendants $28,144.00 as to the defendants' claim for tortious interference with a business relationship since Mishler sold the property for the same price in 2023 as intended in 2020. We disagree. The jury's $28,144.00 tortious interference with a business relationship award is firmly supported by the manifest weight of the evidence. Decisively, Mishler's unequivocal testimony reflecting $28,144.00 in incurred carrying costs, due to the delayed property sale, directly refutes Kern's argument on appeal.

{¶101} For these reasons, after reviewing the evidence and the record on appeal, we conclude that the jury did not lose its way and create such a manifest miscarriage of justice by awarding the defendants $1,463,124.00 in damages.

Consequently, the jury's award of $1,463,124.00 in compensatory damages is not against the manifest weight of the evidence.

**{¶102}** Kern's fourth assignment of error is overruled.

**{¶103}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**MILLER and WILLAMOWSKI, J.J., concur.**

Case No. 8-24-38

# __JUDGMENT ENTRY__

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

 

William R. Zimmerman, Judge

 

Mark C. Miller, Judge

 

John R. Willamowski, Judge

DATED:
/hls